**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROBERT ROSENFELD, Derivatively On Behalf Of FUBOTV INC., | **Case No.:**  21-1953 |
| Plaintiff, | |
| vs. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| EDGAR BRONFMAN, JR., HENRY AHN, IGNACIO FIGUERAS, DANIEL LEFF, LAURA ONOPCHENKO, DAVID GANDLER, PÄR-JÖRGEN PÄRSON, AND SIMONE NARDI, | **JURY DEMANDED** |
| -and- | |
| Defendants, | |
| -and- | |
| FUBOTV INC., | |
| Nominal Defendant. | |

Plaintiff Robert Rosenfeld ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant fuboTV Inc. ("fuboTV" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint").  Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by fuboTV with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by fuboTV's directors and officers from March 23, 2020 through the present (the "Relevant Period").

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).  Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action (defined below) based on violations of the Exchange Act.

3.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

4.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

**Plaintiff**

5.     ***Plaintiff Robert Rosenfeld*** ("Plaintiff") acquired the Company securities and will continue to hold fuboTV shares throughout the pendency of this action.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

**Nominal Defendant**

6.      ***Nominal fuboTV*** is a Florida corporation with a principal place of business at 1330 Avenue of the Americas, New York, NY 10019.  FuboTV shares trade on the NYSE under the ticker symbol "FUBO."

**Director Defendants**

7.      ***Defendant Edgar Bronfman, Jr.*** ("Bronfman") joined the Board in May 2020 following the Merger.  On January 21, 2011, a Paris Trial Court found Bronfman, the Executive Chairman and Director of the Company, guilty of a charge of insider trading on trades that Bronfman made in Vivendi Universal stock.  Defendant Bronfman appealed the conviction, and in May 2014, the Paris Court of Appeal affirmed the Paris Trial Court's decision.  Defendant Bronfman appealed the Paris Court of Appeal's decision to the Appellate Court, which rejected his appeal in April 2017. The final judgment, entered by the Paris Court of Appeal, required Bronfman to pay a 2.5 million Euro fine in connection with the conviction.

8.      On April 29, 2020, the Company entered into a letter agreement, or the Bronfman Letter Agreement, with Bronfman pursuant to which Bronfman agreed to serve as Executive Chairman in addition to serving as a member of the Board. The Bronfman Letter Agreement provides that Bronfman's employment as Executive Chairman is for an indefinite period and is terminable by either Bronfman or the Company upon 30 days' advance written notice.  In the event Bronfman's employment with the Company is terminated by the Company without cause, by Bronfman following the Company's material breach of any agreement between Bronfman and the Company or due to Bronfman's death or disability, any outstanding portion of his option awards, described below, that remains unvested as of the date of such termination of employment will remain outstanding and eligible to vest in accordance with the terms of the applicable stock option

agreement. In addition, any unvested portion of the option awards that remains outstanding as of the date of a change in control of the Company will immediately vest in full and become exercisable.

9.       In May 2020, the Company sold shares of its common stock at $7.00 per share and issued warrants to purchase the Company common stock with an exercise price of $7.00 per share to the following related persons: 285,714 shares of our common stock and a warrant to purchase 285,714 shares of common stock to Waverley Capital, an entity controlled by Bronfman, the Company's Executive Chairman and a director and Leff, a director, for gross proceeds of $1,999,998.00.

10.      **Defendant Henry Ahn** ("Ahn") joined the Board in July 2020.  Defendant Ahn is a member of the Audit Committee and Compensation Committee.

11.      **Defendant Ignacio Figueres** ("Figueras") joined the Board in August 2020.

12.      **Defendant Daniel Leff** ("Leff") joined the Board in July 2020.  Defendant Leff is the Chairman of the Nominating and Corporate Governance Committee.  Defendant Leff is also a member of the Audit Committee.  Defendant Leff is Co-Founder and Managing Partner of Waverley Capital, a media-focused venture capital fund.

13.      In October 2020, the Company sold 200,000 shares of its common stock in a public offering, for an aggregate of $2,000,000 at the public offering price of $10 per share, to Waverley Capital.

14.      **Defendant Laura Onopchenko** ("Onopchenko") joined the Board in September 2020.  Defendant Onopchenko is the Chairman of the Audit Committee.

15.      **Defendant David Gandler** ("Gandler") was appointed as the Company's Chief Executive Officer ("CEO") and Director in April 2020 upon the closing of the Merger.

16.     **Defendant Pär-Jörgen Pärson** ("Pärson") joined the Board in May 2020. Defendant Pärson is the Chairman of the Compensation Committee.  Defendant Pärson is also a member of the Nominating and Corporate Governance.  Defendant Pärson has been a General Partner of Northzone, a venture capital firm, where his primary areas of focus are disruptive businesses in consumer internet, health, and fintech.

17.     In May 2020, the Company sold shares of its common stock at $7.00 per share and issued warrants to purchase its common stock with an exercise price of $7.00 per share to the following related persons:  277,008 shares of the Company's common stock and a warrant to purchase 277,008 shares of the Company's common stock to Northzone VIII L.P., an entity that holds 10.90% of the Company's Series AA Preferred Stock as of October 26, 2020, for gross proceeds of $1,939,056.

18.     Defendants Bronfman, Ahn, Figueras, Onopchenko, Leff, Gandler, and Pärson are herein referred to as "Director Defendants."

**Officer Defendant**

19.     **Defendant Simone Nardi** ("Nardi") has served as the Company's Chief Financial Officer ("CFO") since May 31, 2020.  Defendant Nardi served as Interim CFO since March 2020.

20.     The Company entered into an employment agreement with Nardi, or the Nardi Employment Agreement, effective May 30, 2020, pursuant to which Nardi agreed to serve as the Company's CFO.  Pursuant to the Nardi Employment Agreement, Nardi will receive an annual base salary of $430,000 per year, subject to increase, but not decrease, at the discretion of the compensation committee of the Board and the CFO.  Nardi will be eligible to receive a target maximum annual bonus of $235,000, based on the Company achieving certain performance-based objectives, as established by the Company's compensation committee and the CEO.  In the event

Nardi's employment with the Company is terminated without Cause or for Good Reason (each as defined in the Nardi Employment Agreement) within 12 months following a change of control, any unvested portion of his option award, described below, that remains outstanding as of the date of a change in control of the Company will immediately vest in full and become exercisable. Further, in the event Nardi's employment with the Company is terminated without Cause or for Good Reason, the Company shall pay Nardi an amount equal to 50% of his then annual base salary, other than bonus, as determined as of the date of termination, and any outstanding portion of incentive awards that remains unvested shall immediately vest.  Nardi is also eligible to participate in the Company's employee benefit plans as in effect from time to time on the same terms as generally made available to other senior executives of the Company and have other benefits provided to executives of the Company.

21.     The Director Defendants and Defendant Nardi are collectively referred to herein as "Defendants".

## THE COMPANY'S CORPORATE GOVERNANCE

22.     As members of Board were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

23.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of fuboTV, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company

## DUTIES OF THE DIRECTOR DEFENDANTS

24.     By reason of their positions as officers, directors, and/or fiduciaries of fuboTV and

because of their ability to control the business and corporate affairs of fuboTV, the Director Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage fuboTV in a fair, just, honest, and equitable manner.  The Director Defendants were and are required to act in furtherance of the best interests of fuboTV and its shareholders.

25.     Each director and officer of the Company owes to fuboTV and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

26.     The Director Defendants, because of their positions of control and authority as directors and/or officers of fuboTV, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with fuboTV, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of fuboTV.

27.     To discharge their duties, the officers and directors of fuboTV were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of

fuboTV were required to, among other things:

     (a)    Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

     (b)    Conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

     (c)    Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

     (d)    Remain informed as to how fuboTV conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

     (e)    Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

     (f)    Ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

28.    Each Director Defendant, by virtue of his or her position as a director and/or officer,

owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of fuboTV, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

29.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to misrepresent the information as detailed *infra*.  The Director Defendants' subjected the Company to the costs of defending, and the potential liability from, the securities class action (and related lawsuits).  As a result, fuboTV has expended, and will continue to expend, significant sums of money.

30.     The Director Defendants' actions have irreparably damaged fuboTV's corporate image and goodwill.

## THE AUDIT COMMITTEE CHARTER

31.     The Audit Committee Charter states in relevant part:

The purpose of the Committee shall be to assist the Board in its oversight of:

1.     the accounting and financial reporting processes and internal controls of the Company;

2.     the audit and integrity of the Company's financial statements;

3.     the Company's compliance with applicable law (including U.S. federal securities laws and other legal and regulatory requirements);

4.     the qualifications, independence and performance of the Company's independent auditors; and

5.     the implementation and performance of the Company's internal audit

function, if applicable.

The Committee shall also be responsible for preparing the report required by the Securities and Exchange Commission (the "SEC ") rules to be included in the Company's proxy statement for the annual meeting of stockholders, and for performing other duties and responsibilities as are enumerated in or consistent with this charter.

The function of the Committee is primarily one of oversight. The Company's management is responsible for preparing the Company's financial statements, and the independent auditor is responsible for auditing and reviewing those financial statements. The Committee is responsible for assisting the Board in overseeing the conduct of these activities by management and the independent auditor. The Committee is not responsible for providing any expert or special assurance as to the financial statements or other financial information provided by the Company to its stockholders or others or as to the independent auditor's work.

\*   \*   \*

**RESPONSIBILITIES**

The following are the principal recurring responsibilities of the Committee. The Committee may perform other functions that are consistent with its purpose and applicable law, rules and regulations, and as the Board or Committee deem appropriate. In carrying out its responsibilities, the Committee believes its policies and procedures should remain flexible, in order to best react to changing conditions and circumstances.

\*   \*   \*

Review of Internal Controls and Integrity of Financial Statements . The Committee shall meet with management, the internal audit department, if applicable, and the Company's independent auditor to review and discuss the Company's internal controls and the integrity of the Company's audited financial statements. Included in this process shall be review of:

a.  the scope and timing of the annual audit of the Company's financial statements;

b.  the Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Form 10-K and Form 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations"; the Committee shall make a recommendation to the Board as to whether the audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" should be included in the Company's Form 10-K for filing with the SEC;

c.     the results of the independent audit and the quarterly reviews, and the independent auditor's opinion on the audited financial statements;

d.     the quality and adequacy of the Company's internal controls, and discussion with management and the independent auditor with regard to any significant deficiencies or material weaknesses in the design or operation of, and any material changes in, the Company's internal controls;

e.     the Company's disclosure controls and procedures, as well as the quarterly assessments of such controls and procedures by the Chief Executive Officer and Chief Financial Officer;

f.     any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies;

g.     any analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements;

h.     the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company; and

i.     any audit problems or difficulties the independent auditor encountered in the course of its audit work, including any restrictions on the scope of the independent auditor's activities or on access to requested information, and any significant disagreements with management.

Among the items the Committee shall review with the independent auditor are: Accounting adjustments that were noted or proposed by the auditor but were "passed" (as immaterial or otherwise); any communications between the audit team and the audit firm's national office respecting auditing or accounting issues presented by the engagement; and any "management" or "internal control" letters issued, or proposed to be issued, by the independent auditor. Such review shall also include discussion of the responsibilities, budget and staffing of the Company's internal audit function when the Company has an internal audit function.

4.     Review of Financial Information Presentation, Earnings Press Releases and Guidance.  The Committee shall periodically discuss with management the Company's procedures with respect to the presentation of the Company's financial information (paying attention to any use of "pro forma" or "adjusted" non-GAAP information) and review earnings press releases, earnings guidance provided to analysts and rating agencies and financial information provided to the public, analysts and ratings agencies.

5.     Internal Audit Function . The Committee shall, as applicable, oversee the design, implementation and performance of the Company's internal audit function, including by:

a.      reviewing and approving the charter of the internal audit function
and any amendments;

b.      reviewing the responsibilities, functions, qualifications, budget,
performance, objectivity, and the scope and results of internal audits
[…]

## BACKGROUND

32.      Virtual Multichannel Video Programming Distributors ("vMVPDs"), like FuboTV,

aggregate live and on-demand television content for delivery over the internet.  Unlike traditional

cable TV or satellite provider, FuboTV does not supply its own data transport infrastructure (*e.g.*,

the cable) and instead relies on subscribers to maintain their own internet connection to access its

service.  vMVPDs offer service and product bundles to subscribers offering channels at a lower

monthly rate than offered by traditional cable/satellite providers. There currently are 271 online

video services vMVPDs that provide viewers with content from broadcast and cable network as

well as streaming providers.  Internet-based streaming services and corresponding distribution

platforms have progressed at a staggering pace, allowing for faster and cost-effective

transmissions. According to industry experts, nearly six million subscribers dropped their

traditional pay TV services in the third quarter of 2019 alone. In light of this trend, companies

sought to capitalize the new market.

33.      In recent years, platforms like fuboTV have gained popularity over legacy set-top

cable boxes, as a way to view live TV.  For example, Dish Network first introduced its service

known as "Sling TV" in 2015, through which it offered a selection of popular cable networks

delivered via mobile apps and other digital media players, or over the internet.  By 2018, AT&T,

Hulu, Sony and YouTube TV had all entered the market.  S&P Global Markets Intelligence media

research group reports that the number of virtual multichannel service households will hit 15.3

million by the end of 2022.

34.     Founded in 2015, fuboTV is a sports-first vMVPD offering subscribers access to thousands of live sporting events as well as news and entertainment content.  First launched as a soccer streaming service, fuboTV changed to an all-sports service in 2017 and then to its current vMVPD format.  fuboTV's streaming service is available in the United States, Canada and Spain and consists of different subscription plans offering different channel packages.  In its regulatory filings and public statements, fuboTV positions itself as a content distributor at the intersection of three "megatrends": cord-cutting, connected TV advertising, and online sports wagering.  fuboTV revenues are almost entirely derived from the sale of subscription services and advertising in the United States.

35.     In March 2020, fuboTV announced that it has agreed to merge with FaceBank Group Inc. ("FaceBank"), a leading virtual entertainment company, focused on development, protection and activation of the personal digital likeness assets of celebrities and consumers, for use in artificial intelligence, entertainment, personal productivity and social networking.  Pursuant to the merger agreement between FaceBank and fuboTV, fuboTV became a wholly owned subsidiary of FaceBank and FaceBank was renamed to fuboTV Inc. Through this merger, completed on April 1, 2020, fuboTV "obtained a secured revolving line of credit of $100 million" for the benefit of fuboTV as an "inducement to the willingness of the FuboTV" to enter into the merger agreement.  At the time of the merger, FaceBank's stock was traded over-the-counter under the ticker "FUBO."

## THE FALSE AND MISLEADING STATEMENTS

36.     On March 23, 2020, the Company issued a press release entitled *Facebank Group And FuboTV Announce Definitive Merger Agreement - Combined Company To Be Named*

*FuboTV, Inc.*, which quoted Defendant Gandler regarding the Company's capabilities:

> The business combination of FaceBank Group and fuboTV **accelerates our ability to build a category defining company and supports our goal to provide consumers with a technology-driven cable TV replacement service for the whole family**. With our growing businesses in the U.S., and recent beta launches in Canada and Europe, **fuboTV is well-positioned to achieve its goal of becoming a world-leading live TV streaming platform for premium sports, news and entertainment content. In the current COVID-19 environment, stay-at-home stocks make perfect sense** - we plan to accelerate our timing to up list to a major exchange as soon as practicable. We look forward to working with John and his team of creative visionaries.  [Emphasis added].

37.     On April 2, 2020, FaceBank Group and the Company issued joint press entitled

*FaceBank Group and FuboTV Announce Completion of Merger -- Combined Company to Be*

*Named fuboTV, Inc.*, which quoted Defendant Gandler promoting the Company's capabilities:

> With today's closing, fuboTV is well-positioned to redefine the virtual MVPD space. Technology-driven cable TV replacement services are more important than ever, especially at this time when people are staying safe at home watching television for needed information, entertainment and escape.

38.     On May 29, 2020, the Company (still operating under the name FaceBank Group, Inc.) filed its yearly report on Form 10-K with the SEC for the fiscal year ended December 31, 2019 (the "2019 Annual Report"). The 2019 Annual Report was signed by Defendants Gandler and Bronfman pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), wherein Defendant Gandler certified that "the [2019 Annual Report] does not contain any untrue statements of a material fact" and that "the information included in the [2019 Annual Report] fairly presents, in all material respects, the financial condition and results of operations and cash flows of the [Company]" in compliance with Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934."

39.     The 2019 Annual Report touted the synergies FaceBank Inc. and fuboTV purportedly created:

The Company is a leading digital entertainment company, combining fuboTV's direct-to-consumer live TV streaming platform with FaceBank's technology-driven IP in sports, movies and live performances. ***This business combination, operating as fuboTV, Inc., will create a content delivery platform for traditional and future-form IP. fuboTV plans to leverage FaceBank's IP sharing relationships with leading celebrities and other digital technologies to enhance its already robust sports and entertainment offerings***.

Since the Merger, while we continue our previous business operations, we are principally focused on offering consumers a leading live TV streaming platform for sports, news and entertainment through fuboTV. fuboTV revenues are almost entirely derived from the sale of subscription services and advertising in the United States, though fuboTV has started to assess expansion opportunities into international markets, with operations in Canada and the launch in late 2018 of its first ex-North America offering of streaming entertainment, to consumers in Spain. [Emphasis added].

40.     The 2019 Annual Report also reported the following regarding the Company's

Critical Accounting Policies:

*Acquisitions and Business Combinations*

***The Company allocates the fair value of purchase consideration issued in business combination transactions to the tangible assets acquired, liabilities assumed, and separately identified intangible assets acquired based on their estimated fair values.*** The excess of the fair value of purchase consideration over the fair values of these identifiable assets and liabilities is recorded as goodwill. Such valuations require management to make significant estimates and assumptions, especially with respect to intangible assets. Significant estimates in valuing certain intangible assets include, but are not limited to, future expected cash flows from, acquired technology, trade-marks and trade names, useful lives, and discount rates.

Management's estimates of fair value are based upon assumptions believed to be reasonable, but which are inherently uncertain and unpredictable and, as a result, actual results may differ from estimates. During the measurement period, which is one year from the acquisition date, we may record adjustments to the assets acquired and liabilities assumed, with the corresponding offset to goodwill. Upon the conclusion of the measurement period, any subsequent adjustments are recorded to earnings.  [Emphasis added].

41.     On July 6, 2020, the Company (under the name FaceBank) filed its quarterly report

on SEC Form 10-Q for the first fiscal quarter 2020 ("1Q 2020 Report").  Attached to the 1Q 2020

Report were signed SOX Certifications, wherein Defendants Gandler and Nardi certified that "the [1Q 2020 Report] does not contain any untrue statements of a material fact" and that "the information included in the [1Q 2020 Report] fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]" in compliance with Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934."

42.     In connection with the 1Q 2020 Report, the Company issued a press release, summarizing the Company's financial and operational results, as well as a letter to shareholders released on July 8, 2020 from Defendant Gandler.  In the letter to shareholders, Defendant Gandler reported the Company's strategy and focus:

> *We believe fuboTV is at the forefront of the streaming revolution and has a significant advantage not only over peers in the vMVPD space but also over traditional cable television.* We offer cord-cutters a total cable TV replacement with top Nielsen-ranked sports, news and entertainment channels. *What sets fuboTV apart is our internally built tech stack that keeps us innovating ahead of the industry.* With premium features like 4K streaming, personalized live TV recommendations and recent app updates that integrate live video into the product experience, *we believe a fuboTV subscription offers consumers the best value of any other live TV streaming platform*. We believe consumers will continue to choose streaming over traditional pay television because of this more personalized, premium viewing experience that is also less expensive.
>
> fuboTV had an extremely productive Q1, despite a complete shutdown of sports, *and we have made several significant recent announcements that highlight the competitive strength of our company and further differentiate us in the marketplace*. While we expect that the COVID-19 pandemic will have lasting effects on consumer behavior and live television viewing, vMVPDs are also a more affordable alternative to pay TV, which, we believe, in this current economic climate, further accelerates adoption. *We believe we are well positioned as a leader in the industry.*  [Emphasis added].

43.     On August 10, 2020, the Company changed its name to fuboTV Inc. and as of May 1, 2020, the Company's trading symbol was changed to "FUBO."

44.     On August 13, 2020, the Company filed its quarterly report on SEC Form 10-Q for the second fiscal quarter 2020 ("2Q 2020 Report"). Attached to the 2Q 2020 Report were signed

SOX Certifications, wherein Defendants Gandler and Nardi certified that "the [2Q 2020 Report] does not contain any untrue statements of a material fact" and that "the information included in the [2Q 2020 Report] fairly presents, in all material respects, the financial condition and results of operations and cash flows of the [Company] in compliance with Section13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934."

45.     In connection with the 2Q 2020 Report, the Company issued a press release, summarizing the Company's financial and operational results.  The press release quoted Defendant Gandler:

> We believe consumers will continue to choose streaming over traditional pay television, especially in the current economic climate because of its more personalized, premium viewing experience. ***Macro trends towards streaming, combined with our strong second quarter results and continued momentum, reinforce our confidence in our business and the vMVPD space***. Looking ahead to Q3, with the gradual return of sports, we anticipate an increase in subscribers, viewership and that our portion of revenue derived from advertising will grow. At the close of Q3 we expect paid subscribers to reach 340,000 - 350,000, which will be an increase of 20% year-over-year. The growth of streaming is one of the most significant changes to television, and television advertising, in the last several decades. ***fuboTV is at the forefront of the streaming revolution and we are excited for existing and new investors to join us on this journey***.  [Emphasis added].

46.     Also, in connection with the 2Q 2020 Report, the Company furnished a letter to shareholders dated August 13, 2020 from Defendant Gandler. In the letter to shareholders, Defendant Gandler reiterated that the Company was "at the forefront of the streaming revolution":

> The strength of the streaming business during the pandemic is a clear sign that vMVPDs have a bright future. fuboTV's solid second quarter validated our belief that consumers are seeking lower cost alternatives to traditional television. Our streaming hours grew over the prior year despite a near total shutdown of sports.
>
> This is primarily a result of fuboTV's expanded programming offering for the entire family combined with product innovations that deliver a premium viewing experience not available through traditional television.  We expect streaming hours to grow as sports return.

47.     On September 15, 2020, the Company furnished another letter to shareholders

addressed from Defendant Gandler, in which Defendant Gandler promoted the Company's business model and future growth strategy:

> [W]e continue to believe fuboTV is at the forefront of the streaming TV revolution. fuboTV is the leading sports-first, live TV streaming platform, offering subscribers access to tens of thousands of live sporting events annually as well as leading news and entertainment content. We offer a broad mix of 100+ channels, including 43 of the top 50 Nielsen-ranked networks across sports, news and entertainment (Primetime A18-49), making fuboTV a leading cable TV replacement product for the entire household. Our retention rate has remained high during the pandemic as customers have found a diverse range of content on the platform to satisfy their needs.

> At the core of our offering is our proprietary technology platform optimized for live TV and sports viewership. Our proprietary technology stack has enabled us to regularly offer new features and functionality. For example, we were the first virtual multichannel video programming distributor (vMVPD) to stream in 4K resolution. We also offer multi-view on Apple TV, which enables subscribers to watch two live streams simultaneously, as well as the ability to watch select sports content from multiple camera angles.

> * * *

> Furthermore, we believe fuboTV's sports package is unparalleled in the marketplace. fuboTV offers more than 50,000 live sporting events each year and is the only vMVPD streaming 11 Thursday Night Football (FOX) games in 4K this season. The start of the NFL season has been significant for fuboTV. It's been widely publicized that television ratings declined nearly 13% for the NFL's 2020 Kickoff Game on Thursday, September 10. fuboTV, on the other hand, has achieved record viewership with our NFL carriage. On Sunday, September 13, our viewing hours doubled year-over-year and reached one million hours for the first time. Cord-cutters are clearly embracing streaming platforms for sports viewing. [Emphasis added].

48.   Defendant Gandler summarized the Company's performance and strategy: "fuboTV continues on the path of solid growth with double digital revenue and subscriber increases year-over-year [and are] confident in the continued strength of our business . . . ."

49.   On August 11, 2020, the Company filed with the SEC a Registration Statement on Form S-1 signed by Defendants Gandler, Nardi, and Bronfman, relating to the proposed follow-on public offering of its common stock. On September 15, 2020, October 1, 2020, and October 5,

2020, the Company filed revised versions of the Registration Statement on Forms S-1/A, each of which was signed by Defendants Gandler and Nardi. On October 7, 2020, the Registration Statement was declared effective by the SEC.  The Registration Statement was incorporated into and formed part of the Prospectus filed on October 9, 2020.

50.     The Company offered to sell to the public 18.3 million common shares (excluding the underwriters' option to purchase an additional 2.75 million common shares), for $10 per share. The Company closed its public offering of 19,706,708 common stock on October 13, 2020, including the full exercise of the underwriters' option, generating $ 197 million in gross offering proceeds.

51.     The Prospectus Summary contained materially false and misleading statements concerning the Company's to business model:

> Our business model is 'come for the sports, stay for the entertainment.' ***This translates to leveraging sporting events to acquire Subscribers at lower acquisition costs, given the built-in demand for sports. We then leverage our technology and data to drive higher engagement and induce retentive behaviors such as favoriting channels, recording shows, and increasing discovery through our proprietary machine learning recommendations engine. Next, we look to monetize our growing base of highly engaged subscribers by driving higher average revenue per user (ARPU).*** [Emphasis added].

52.     The Registration Statement identified the Company's "Competitive Strengths," which purportedly contributed to the Company's past revenue and subscriber growth:

> ***Our Competitive Strengths***
>
> We believe that fuboTV Pre-Merger's revenue and subscriber growth are a result of the following competitive strengths:
>
> - ***Comprehensive Sports, News & Entertainment Offering.*** While we continue to attract consumers with our extensive premium sports content, we believe our increasingly broad and deep news and entertainment content offerings enhances total viewership and retention of our users as a pay TV replacement. We believe we will continue to optimize our content offering by identifying and executing strategic deals that best suit our consumers'

preferences.

- **Delivering Significant Value to Our Subscribers.** We seek to provide a flexible product offering, delivering leading bundles for consumers that best meet their target price point. fuboTV's base package is less expensive than traditional cable or satellite options and includes a broad array of 100+ channels across sports, news and entertainment.

- **Proprietary Technology and First-Party Data.** Because we design, develop and operate all core segments of our platform, we are able to capture and analyze how our subscribers engage our offering. These unique data insights allow us to better understand and continually adjust our product and strategy to better meet the needs of our subscribers.

- **Intuitive User Experience.** We are continuing to innovate to give subscribers a premium viewing experience that they are unable to find with cable TV and are regularly first-to-market with new product features. Our product is highly customizable and provides an optimized experience for personalized live streaming, including capabilities such as unique user profiles, multiple angle and screen viewing for sports, favorites lists, a dynamic recommendation engine and Cloud DVR offerings.

- **Efficiency of Cloud-based OTT model.** fuboTV's capital-efficient cloudbased OTT model doesn't require us to devote capex to procuring, maintaining inventory of and delivering superfluous, and often outdated, proprietary set-top boxes to customers that do not want or need them. Furthermore, our proprietary technology infrastructure is highly scalable, which we expect to provide ongoing cost and margin advantages as we grow.

53.     Regarding the Company's growth, the Registration Statement provided:

Our growth strategy is to acquire subscribers who are attracted to our premium sports offering and can find with us a compelling sports, news and entertainment viewing alternative to a traditional pay TV service. We actively engage those subscribers by providing a seamless pay TV replacement through a personalized easy-to-use streaming product at a significantly lower cost than traditional pay TV providers. We then monetize our engaged audience through subscription fees and our digital advertising offering. **Today, the vast majority of our revenue is generated from monthly subscriptions.** We have improved our margins, as well as our engagement levels, by enabling subscribers to select attachments such as Cloud DVR Plus and Family Share and to subscribe to premium channel packages like Sports Plus with NFL RedZone and International Sports Plus. **We believe a significant opportunity for fuboTV is to allow advertisers to access our audience by leveraging our technology, data, and measurability to drive returns on advertising spend.** [Emphasis added].

54.     Rather than disclose the truth, the Registration Statement highlighted the Company's purported success in growing advertising revenue:

*Advertisers*

We believe our leading, independent live TV streaming platform offers a unique opportunity to advertisers. As cord cutting continues and traditional linear TV viewers decline, advertisers are increasingly allocating their ad budgets to OTT platforms to reach these audiences. fuboTV's sports-first live TV platform offers advertisers a growing and increasingly valuable live audience and provides un-skippable ad inventory on high quality content. We believe our growing subscriber base and increasing household viewing hours makes the platform highly attractive to advertisers. Advertisers also benefit from combining traditional TV advertising formats with the advantages of digital advertising including measurability, relevancy and interactivity.

55.     The Registration likewise stated: "We believe our premium content and industry leading consumer experience uniquely position us to rapidly grow our advertising business."

56.     On November 10, 2020, the Company issued a press release announcing the results of its financial performance for its third fiscal quarter ended September 30, 2020.  The press release touted the Company's results, stating that the Company "delivered the strongest quarter in its history and exceeded previously raised guidance with solid growth in revenue, subscription and engagement."  Defendant Gandler reiterated these claims, stating that the Company had "the strongest quarter in FuboTV's history, exceeding targets in all of [its] key metrics."  Further, Defendant Bronfman echoed these positive sentiments, claiming that:

We believe that fuboTV sits firmly at the intersection of three megatrends: the secular decline of traditional TV viewership, the shift of TV ad dollars to connected TVs and online sports wagering, a market which we intend to enter.  ***As a result, we believe our growth opportunities are numerous. Our optimism in the future of fuboTV and the live TV streaming business has never been stronger.*** [Emphasis added].

57.     In a letter to shareholders, signed by Defendant Bronfman and released on the same day, November 10, 2020, the Company touted its "proprietary data and technology platform" as

purportedly being the key to its success and future growth:

> ***Our financial model is driven by strong unit economics. We expect margin improvement to continue over time, aided by a number of initiatives. This includes the growth of advertising on our platform along with strong attachment rates on value-added services***, such as cloud DVR storage and the ability to stream on multiple devices.
>
> We believe fuboTV sits firmly at the intersection of three industry megatrends: the secular decline of traditional TV viewership, the shift of TV ad dollars to connected TVs and online sports wagering. ***Our strong subscriber growth indicates consumers are cutting the cord faster than ever before, and our increased viewer engagement has driven fuboTV's ad sales growth.***
>
> We've previously said that we see the online wagering space - a market expected to reach $155 billion by 2024 according to Zion Market Research - as complementary to our sports-first live TV streaming platform. We believe there is a flywheel opportunity with video content and interactivity. As our cable TV replacement product is sports-focused, we believe a significant portion of our subscribers would be interested in online wagering, creating a unique opportunity to drive higher subscriber engagement and open up additional revenue opportunities. Simply put, we expect wagering will lead to more viewing, and this increased engagement will lead to higher ad monetization, better subscriber retention and a reduction in subscriber acquisition costs.
>
> Therefore, we are excited to announce that fuboTV intends to expand into the online sports wagering market. ***Our goal with wagering is to develop a new revenue stream for fuboTV, and one which we believe will be an important contributor to our business.***
>
> We expect to share more tactical details as appropriate. And, of course, we expect to continue to grow our subscribers which will positively impact any decision we make on wagering.  [Emphasis added].

58.    As to the Company's financial performance, the letter to shareholders provided certain financial highlights, including information pertaining to its subscription rate and growth, stating:

- [The Company's] revenues for the third quarter 2020 were $61.2 million, a 47% increase year-over-year on a pro forma basis, or +71% excluding licensing revenue from FaceBank AG. This growth ahead of guidance, was driven by continued subscriber expansion, an increase in subscription Average Revenue Per User (ARPU) and growth of advertising sales:

- Subscription revenue increased 64% year-over-year to $53.4 million.

- Advertising revenue increased 153% year-over-year to $7.5 million.

- Paid subscribers at quarter end totaled 455,000, an increase of 58% year-over-year.

- Average Revenue Per User (ARPU) per month was $67.70, up 14% year-over-year.

- Total content hours streamed by fuboTV users (paid and free trial) increased 83% year-over-year to 133.3 million hours.

- Monthly active users (MAUs) watched 121 hours per month on average in the quarter, an increase of 20% year-over-year.

* * *

- We use adjusted contribution margin to measure the variable costs against subscriber revenue: adjusted contribution margin was positive 16.1% in Q3 2020, up from 0.5% in Q3 2019. ***The improvement was driven by growth in subscription ARPU, growth in advertising ARPU and a reduction in the average cost per user (ACPU), mainly driven by lower per-subscriber content expenses***. Q3 2020 adjusted contribution margin benefitted in part from the unusual timing of some content deal negotiations in July. Adjusted for this unusual, one-time impact, the Q3 2020 adjusted contribution margin would have been approximately 10.5%. Please refer to the reconciliation of revenue to adjusted contribution margin in the non-GAAP information in the tables accompanying this letter.  [Emphasis added].

59.   As to it's the financial guidance, the Company raised its Q4 guidance, stating that it expected "Q4 revenues to be $80-85 million, a 51% to 60% increase year-over-year.  We also expect to end the fourth quarter with 500,000-510,000 paid subscribers, an increase of 58% to 62% year-over-year."  In addition, the Company represented that expected full year 2020 revenue to be "$244-248 million, an increase of over 65% year-over-year."  And its full year 2021 revenue to be "$415-435 million, an increase of over 70% year-over-year."

60.   The letter to shareholders ended with a summary of the Company's claims of future revenue and subscription growth and promising growth of advertising:

The growth of advertising on our platform along with strong attachment rates on value-added services, such as cloud DVR storage and the ability to stream on multiple devices, continue to improve margins. Furthermore, we believe fuboTV's differentiation in the marketplace - sports-focused programming and a tech-first user experience - firmly positions the company for long-term growth. We are also excited about the potential growth and revenue opportunities around our intended expansion into online sports wagering.

61.    On the same day, November 10, 2020, the Company hosted an earnings call with the analysts to discuss its financial results and operations.  During the call, Defendant Gandler touted the Company's results:

And from an execution standpoint Q3 was by far the strongest quarter in the company's history. Our results have exceeded previously raised guidance with solid growth across every KPI we track. Revenues were up 47% to $61 million, that's well ahead of the guidance range we provided $52 million to $55 million. Our business is really comprised of two components. Subscription revenue which was up 64%, and advertising revenue, which was up in amazing 153%. Ad revenue for the quarter exceeded 12%, and to put that into context 2019 Ad revenue represented roughly about 8%.

So you can see why we're so excited about the quarter and about our guidance in Q4 and for full-year 2021. Paid subscribers are quite a rental the 455,000 and that's 58% above the 288,000 last year. Net additions came in at 167,000 that's up almost 100% year-over-year.

* * *

And advertising sales, which I've already highlighted earlier, clearly plays an important role in margin expansion. At the end of the day, we made some really bold moves in the quarter and that really speaks to our ability to leverage our proprietary data.  And so it also speaks to our the quality of our execution. As you all know, it's tough to expand margins while growing your sub base at this current pace.

62.    Regarding the Company's future growth, Defendant Gandler assured the market that the Company was positioned for future growth due to tailwinds from "three mega trends":

**The tailwinds have never been stronger.  Fubo is firmly at the intersection of three mega trends. The first is the secular decline of traditional television viewership. The second is the shift of TV ad dollars to connect the devices. And the third is online sports wagering a market we absolutely intend to enter**.

24

> ***Our growth opportunities are numerous, and there are a great many reasons for
> us to be optimistic given the optionality in the business.*** Since some of you are
> new to the story, it might be helpful for me to provide a quick background on who
> we are. In 2015, we found it Fubo introducing a live streaming platform to serve
> the needs of U.S. soccer fans, that we're unable to watch international soccer leaks.
> We quickly learned the soccer fans wanted three things: they wanted a greater
> breadth of sports and entertainment content; they wanted an intuitive user
> experience; and they, of course, wanted exceptional value.  [Emphasis added].

63.     Once again, Defendant Gandler touted the Company's proprietary data and
technology and assured investors of improved retention, which was purportedly due to the
Company's differentiated offering and personalized premium viewing experience:

> Supporting our offerings is our proprietary data and technology platform that really
> optimized for live TV and sports, our platform has enabled us to regularly offer
> new features and functionality for our subscribers.  To the best of my knowledge
> we are still the only virtual MVPD to stream live sports in 4K.
>
> * * *
>
> We believe our platform offers a more differentiated, a more personalized premium
> viewing experience for sports fans. And that's really reflected in the recent reports
> highlighting customer satisfaction relative to our peers. And it also is reflected in
> our app ratings, and most importantly is reflected in our improving retention.

64.     In response to Evercore ISI analyst, Kevin Rippey's question regarding the
Company's plans on expanding sports gambling, Defendant Gandler represented that the Company
had "already started executing on its [wagering] strategy" and that it is "going to be able to also
sell in a lot of wagering opportunities" given its "acquisitions advantage," "engagement
advantage," and "monetization advantage."

65.     On November 16, 2020, the Company filed its quarterly report on SEC Form 10-Q
for the third fiscal quarter 2020 ("3Q 2020 Report").  Attached to the 3Q 2020 Report were signed
SOX Certifications, wherein Defendants Gandler and Nardi certified that "the [3Q 2020 Report]
does not contain any untrue statements of a material fact" and that "the information included in
the [3Q 2020 Report] fairly presents, in all material respects, the financial condition and results of

operations and cash flows of the [Company] in compliance with Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934."

66.     On December 1, 2020, the Company issued a press release, announcing the acquisition of Balto Sports, a company that develops tools for users to organize and play fantasy sports games.  In the press release, Defendant Gandler promoted the move as "instrumental" expansion of the Company's sports betting ambitions:

> ***We believe there are significant synergies between consumers who enjoy wagering and our subscribers who enjoy streaming live sports, creating a flywheel opportunity***. As we've previously expressed, one of our goals with wagering is to expand our total available market (TAM) by developing another important revenue stream for fuboTV, as we are doing with our growing ad sales business.
>
> The acquisition of Balto Sports will enable us to build a first class, free to play experience that brings consumers the best games around live sports. From there, we see a natural progression to layer on real money wagering in regulated markets complementing fuboTV's live streaming video for a highly engaging user experience within our platform. We will be strategic in our approach to wagering as we consider and evaluate different opportunities and will adjust our plans accordingly. We're excited to launch sports wagering, integrate it into our core offerings and deliver what we believe will be a truly groundbreaking live TV streaming platform to consumers.  [Emphasis added].

67.     On December 9, 2020, the Company participated in a BMO Capital Markets 2020 Growth & ESG Conference to give the investors updates on its performance.   During the conference, Defendant Gandler touted the Company's strategy and its use of sophisticated algorithms as purportedly responsible for the surge in viewership:

> And so what happened with fubo I think it's really important for us and this is why we have confidence in our strategy is that while we weren't able to acquire anybody, we were really able to retain a lot of people. Viewing hours have gone from something like 120, 121, 123 to about 145 hours. . . . That is an enormous amount of viewing time. So couple takeaways from there.  ***One is the strategy works. We were able to surface more and more content that people like*** and I think you hit the nail on the head when you said some people get you at hello, we got your wife in reality TV and ***I think this gave us an opportunity to continue to play with our guys to look at our machine learning algorithms and to get people to***

*watch more, which also led to obviously a better advertising conversion. So that's what we were focused on before the sport season came back*.  [Emphasis added].

68.    When asked about the acquisition of Balto Sports, Defendant Gandler promoted the acquisition, highlighting the synergies between the two companies:

*And so we needed to make sure that this was a team that had a very specific skill set that we did not have, but yet was small enough that we can integrate into our larger group and allow them to leverage the resources and the metadata mapping and things that we think are going to allow us to really build something compelling*.

And so the reason why Balto was because again, they are in the pick'ems game, they have had, over 30,000 players test the platform. They understand automation. We understand consumer journeys. We understand what we should be looking at from conversion funnels. And what this is going to allow us to do is launch a game at the end of the, I'll call it, first half of the year 2021. Don't hold me to it, but just say call it, June. These guys are going to be joining us, I think next week finally. So we're very excited about that. We've been planning.

69.    Regarding gambling opportunities, Defendant Gandler provided conflicting commentary, stating at one point that "We're building our free to play our strategy right now. Doing all the data mapping.  Understanding which gains were and then eventually as we get into the second phase of this is where we're looking for an entry point into wagering in terms of potentially becoming a sports book."  At a different time during the conference, Defendant Gandler sought to tamp down expectations for fuboTV sports betting, stating instead, that "no one should think of us as a . . . wagering company, we're not competing with DraftKings."  The BMO analyst picked on the contradictory statements and asked point-blank whether fuboTV was looking to become a licensed real money gaming operator, to which Defendant Gandler did not commit beyond saying it was a "clear option."

70.    The Company's positive musings about the acquisition of Balto Sports' worked. Following this news, several securities analysts raised price targets and began incorporating Balto Sports' valuation into FuboTV's own valuation.

71.     The above statements identified in ¶¶ 36-70 were materially false and misleading statements and failed to disclose material adverse facts about the Company's business, operational, and compliance policies. Specifically, Defendants made false and/or misleading statements and failed to disclose to investors that: (i) fuboTV's growth in subscriber and profitability were unsustainable past the seasonal surge in subscription levels; (ii) fuboTV offering of products was subject to undisclosed cost escalations; (iii) fuboTV could not successfully compete and perform as sports book operator and could not capitalize on its only sports wagering opportunity; (iv) fuboTV's data and inventory was not differentiated to allow fuboTV to achieve long-term advertising growth goals and forecasts; (v) fuboTV's valuation was overstated in light of its total revenue and subscription levels; (vi) the acquisition of Balto Sport did not provide the stated synergies, internal expertise, and did not expand the Company's addressable market into online sports wagering; and as a result, the Company's public statements were materially false and/or misleading at all relevant times.

## THE TRUTH BEGINS TO EMERGE

72.     On December 23, 2020 — following days of meteoric rise—Richard Greenfield of Lightshed Partners ("Lightshed") initiated coverage of the Company at a sell rating and a $8 one-year price target.  In connection with initiating coverage, Lightshed called prospects of the Company achieving success with sports betting a "pure fantasy."  Lightshed further observed that the Company "[may be] the most compelling short we have ever identified in our career as analysts."

73.     On the same day, the Company was downgraded by BMO Capital Markets to "market perform" from "outperform," noting that the Company "valuation had gotten overheated" and explaining that "Fubo parted ways with WarnerMedia networks earlier this year, so it won't

have a chunk of NBA regular-season games or the NCAA men's basketball tournament."

74.      On this news, the shares of the Company declined $11.9, or 21.22% over two days, to close at $44.18 on December 24, 2020.

75.      On December 27, 2020, Lightshed filed another report entitled *FuboTV is a Money Losing vMVPD, FuboTv is not Roku nor FanDuel; Sell Now*, in which Lightshed called the Company a "money-losing virtual MVPD" and urged investors to sell Fubo securities. Lighshed questioned whether Fubo can turn its "fundamentally flawed MVDP/vMVPD business into a good one, especially if it lacks scale and other product bundles."  Citing an "army of retail investors" as the reason for the gain in the stock's popularity, Lightshed further rejected Fubo's differentiation theory, stating that: "Fubo is not Netflix, Fubo is not Flutter/FanDuel, DraftKings nor even Penn/Barstool Sports, Fubo is not Roku and Fubo is not Trade Desk.  Fubo is simply just another virtual multichannel video programming distributor (vMVPD) facing the same obstacles and financial challenges as every other vMVPD."

76.      On the publication of Lightshed's second report, which harshly criticized the Company's business model, the price of the Company shares declined $5.24, or 11.86%, to close at $38.94, on December 28, 2020.

77.      On December 28, 2020, the barrage by securities analysts continued with Hedgeye analyst, Andrew Freedman, questioning the Company's valuation on the grounds that "a more bullish scenario with 1.5M paid subscribers, $100 ARPU, and 15% adjusted EBITDA margin still only gets the stock up to $23/share."

78.      On this news, the Company's shares declined additional 0.51%, to close at $38.74 on December 29, 2020.

79.      The Company's shares continued its downward spiral on December 30, 2020, when

Kerrisdale Capital published a report entitled "fuboTV Inc. (FUBO), Requiem for a Stream ("Kerrisdale Report"), which comprehensively dismantled all aspects of the Company's business model and exposed the Company's flawed strategy.  More specifically, the Kerrisdale Report attacked the Company's core subscription business as "structurally unprofitable," due to "high variable content costs with contracted escalators," which burdened revenue stream and prevented the Company from ever making any money.

80.    The Kerrisdale Report sided with other securities analysts in criticizing the Company's valuation as "absurd" given the size of its core subscription business and its "flimsy valuation comparison" to Roku, which, unlike the Company, has an immense range of content with dominant market share.

81.    The Kerrisdale Report further revealed that the Company "does not have any data or inventory that is differentiated and cannot provide the reach many advertisers crave." The Kerrisdale Report explained that connected TV, which is the source of advertising revenue, has been on a decline in the past two years with a massive increase in ad inventory being anticipated in the coming years.  The Company, having "nothing to differentiate itself [and] levers pull to meaningfully improve its pricing," has no ability to sell more advertising.

82.    The Kerrisdale Report also criticized the Company's acquisition of Balto Sports as a "foolish" attempt to enter the "already highly competitive space [of sport wagering]." The Company used sports betting as bait for the investors by announcing that "fuboTV intends to expand into online sports wagering market" in its November 10, 2020 Letter to Shareholders but then acquiring Balto Sports, "a company with 3 employees," "no valuable IP," and "a failed test product" that "had mothballed operations during the pandemic."

83.    The Report questioned the Company's strategy: "dropping content to manage costs

is reactionary and destined to cause eventual spikes in churn and SAC.  All the Company can do is continue to raise price, take on more and more expensive tiers, thereby shrinking its addressable market."  According to the Report, the Company's large increase in new sign-up activity was due to resumption of sporting activity [after it was halted due to COVID-19 Pandemic] and the U.S. presidential election, and those numbers will not be repeated.  As per the Report, the Company app download data suggests gross additions have collapsed since Election day and sit at a flat level compared to last year.

84.    On the publication of the Kerrisdale Report, the Company shares declined another $9.7, or 25.72%, to close at $28.00 on December 31, 2020, on unusually high trading volume.

85.    Then, on January 4, 2021, *Motley Fool* published an article titled *There's a Big Problem with FuboTV Stock* with a subtitle "The wildly unprofitable streamer tries to put lipstick on a pig with a creative metric."  The *Motley Fool* article questioned the Company's business model, reporting that the Company is "nowhere close to turning a profit" as "direct costs of delivering its service are higher than revenue."  Relatedly, the article noted that "subscriber related expenses, which include affiliate distribution rights and cloud computing charges, among other things, were slightly higher than revenue in the third quarter."

86.    The *Motley Fool* article also questioned Company's other financial metrics including Non-GAAP adjusted contribution margin, which fuboTV reported to be 16.1%, and accused FuboTV of "concoct[ing] a profitability metric that's positive," concluding:

> It should now be pretty clear that fuboTV's adjusted contribution margin is a meaningless number. It's a function of how quickly the company is gaining subscribers, not a representation of profitability. The fact that the company reports such a misleading metric is a huge red flag. It's reason enough to stay far away from the stock

87.    On this news, the Company shares declined additional $3.99, or 14%, to close at

$24.24 on January 4, 2021.

## DAMAGES TO THE COMPANY

88.     As a direct and proximate result of Defendants' conduct, the Company will lose and expend many millions of dollars.

89.     Such expenditures include, but are not limited to, legal fees and payments associated with the numerous lawsuits and other actions lodged against the Company as a result of the misconduct discussed herein.

90.     In addition, these losses include, but are not limited to, lavish compensation and benefits paid to Defendants who breached their fiduciary duties to the Company.

91.     As a direct and proximate result of Defendants' conduct, the Company has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

146.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of Defendants' violations of Sections 10(b) and 21D of the Exchange Act, and their breaches of fiduciary duties and other wrongful conduct as alleged herein and that occurred during the Relevant Period.

147.    Plaintiff will adequately and fairly represent the interests of fuboTV in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

148.   Plaintiff is a current owner of the Company stock and has been an owner of Company stock during the Relevant Period.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

149.   Because of the facts set forth herein, Plaintiff has not made a demand on the Board of the Company to institute this action against the Director Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

150.   At the time this suit was filed, the Board was comprised of seven (7) members -- _ Bronfman, Ahn, Figueras, Onopchenko, Leff, Gandler, and Pärson.  Thus, Plaintiff is required to show that a majority of Defendants, *i.e.*, four (4), could not exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

151.   The Director Defendants face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning the information described herein.  Because of their advisory, executive, managerial, and directorial positions with the Company, the Director Defendants had knowledge of material non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

152.   The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

153.   The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this

Complaint, Plaintiff did not make (and was excused from making) a pre-filing demand on the Board to initiate this action because making a demand would have been a futile and useless act.

154.   Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

155.   Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

156.   Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**THE DIRECTOR DEFENDANTS WERE NOT INDEPENDENT**

**Defendant Gandler**

157.   Defendant Gandler serves as the Company's CEO.  The Company provides Defendant White with his principal occupation, and he receives handsome compensation for his services.  Defendant Gandler was responsible for most of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings referenced herein, many of which he either personally made or signed off on.

158.   Further, Defendant Gandler is a defendant in the securities class action entitled *Ibrahim v. FuboTV, Inc., et al.*, Case 1:21-cv-01412 (S.D.N.Y.) and *Lee v. FuboTV, Inc., et al.*,

Case 1:21-cv-01641 ("Securities Class Action) and faces a substantial likelihood of liability; therefore, demand on Defendant Gandler is futile.

**Defendants Onopchenko, Ahn and Leff**

159.    Defendants Onopchenko, Ahn and Leff served as members of the Audit Committee during the Relevant Period.  Pursuant to the Audit Committee Charter, the Audit Committee Defendants were responsible for, *inter alia*, the effectiveness of the Company's internal controls, the integrity of its financial statements, and aspects of risk management and legal and regulatory compliance that may affect the Company's financial reporting. Defendants Onopchenko, Ahn and Leff failed to ensure the integrity of the Company's internal controls, as they are charged to do under the Audit Committee Charter and to issue false and misleading financial statements with the SEC.  Thus, Defendants Onopchenko, Ahn and Leff breached their fiduciary duties, are not disinterested, and demand is excused as to them.

**Defendant Bronfman**

160.    Defendant Bronfman is a defendant in the Securities Class Action and faces a substantial likelihood of liability; therefore, demand on Defendant Bronfman is futile.

**Defendant Bronfman and Leff**

161.    Defendant Bronfman and Leff are both high ranking executive members of Waverley Capital, a media-focused venture capital firm.

162.    Defendant Leff is Co-Founder and Managing Partner of Waverley Capital.

163.    Defendant Bronfman is also a Co-Founder and Chairman of Waverley Capital.

164.    As a result of Defendants Bronfman and Leff's close business ties, they are unable to evaluate a demand with independence, and therefore, demand is excused as to Defendant Bronfman and Leff.

**Defendant Ahn**

165.    Defendant Ahn has served as President of Content Distribution and Partnerships for Univision Communications Inc., or Univision, since July 2018.

166.    The Company has entered into affiliate distribution agreements with ***New Univision Enterprises, LLC*** and related entities, AMC Network Ventures, LLC and related entities, Viacom International, Inc. and related entities and Discovery, Inc. and related entities, which are holders of the Company's convertible preferred stock.

<u>COUNT I</u>

**(Against Defendants Gandler, Bronfman, and Nardi for Violations of Sections 10(b) and 21D Of The Exchange Act)**

146.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

147.    The Company, along with Defendants Gandler, Bronfman, and Nardi are named as defendants in the Securities Class Action, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.  If and when the Company is found liable in the Securities Class Actions for these violations of law, the Company's liability will be in whole or in part due to Defendants Gandler, Bronfman, and Nardi's willful and/or reckless violations of their obligations as officers and directors of the Company.

148.    Through their positions of control and authority as officers of the Company, Defendants Gandler, Bronfman, and Nardi were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts described in the Securities Class Action and herein.

149.     As such, Defendants Gandler, Bronfman, and Nardi are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

## COUNT III

### (Against the Director Defendants for Breach of Fiduciary Duty)

150.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

151.     The Director Defendants owed the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

152.     The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

153.     The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to estimate its reserves set aside for annuity and pension payments, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

154.     As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.   As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

155.     As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.   Such damage includes, among other things, costs associated with defending and/or settling securities lawsuits and governmental investigations, severe damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT IV

### (Against the Director Defendants for Waste of Corporate Assets)

156.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

157.     The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.   It resulted in continuous, connected, and ongoing harm to the Company.

158.     As a result of the misconduct described above, the Director Defendants wasted corporate assets by, *inter alia*: (a) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (b) awarding self-interested stock options to certain officers and directors; and (c) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle actions addressing Defendants' unlawful actions.

159.     As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

160.     Plaintiff, on behalf of the Company, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(A)     Declaring that Plaintiff may maintain this action on behalf of the Company and that Plaintiff is an adequate representative of the Company;

(B)     Finding Defendants liable for breaching their fiduciary duties owed to the Company;

(C)     Directing Defendants to take all necessary actions to reform and improve the Company's corporate governance, risk management, and internal operating procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the rampant wrongful conduct described herein;

(D)     Awarding damages to the Company for the harm the Company suffered as a result of the Defendants' wrongful conduct;

(E)     Awarding damages to the Company for Defendants Gandler, Bronfman, and Nardi's violations of Sections 10(b) and 21D of the Exchange Act;

(F)     Awarding Plaintiff the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

(G)     Awarding such other and further relief as is just and equitable.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: March 5, 2021

**GAINEY McKENNA & EGLESTON**

By: _/s/ Gregory M. Egleston_
    Gregory M. Egleston
Thomas J. McKenna
501 Fifth Avenue, 19th Floor

New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: gegleston@gme-law.com
Email: tjmckenna@gme-law.com

***Attorneys for Plaintiff***

## VERIFICATION

I, ROBERT ROSENFELD, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of fuboTV, Inc. ("FuboTV") and authorize its filing.   I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true.  I further declare that I am a current holder, and have been a holder, of fuboTV as set forth in the Complaint.

Executed this _28TH_ day of February 2021.


ROBERT ROSENFELD