**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROBERT ROSENFELD, Derivatively On Behalf Of FUBOTV INC., | Case No.: 1:21-cv-01953 (JSR) |
| Plaintiff, | |
| vs. | **AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| EDGAR BRONFMAN, JR., DANIEL LEFF, DAVID GANDLER, HENRY AHN, IGNACIO FIGUERAS, LAURA ONOPCHENKO, PÄR-JÖRGEN PÄRSON, AND SIMONE NARDI, | |
| -and- | **JURY DEMANDED** |
| Defendants, | |
| -and- | |
| FUBOTV INC., | |
| Nominal Defendant. | |

Plaintiff Robert Rosenfeld ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant fuboTV Inc. ("fuboTV" or the "Company"), submits this Amended Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by fuboTV with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by fuboTV's directors and officers from March 23, 2020 through the present (the "Relevant Period").

## JURISDICTION AND VENUE

2.      Jurisdiction is conferred by 28 U.S.C. §1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interests and costs.

3.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

4.      Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## BACKGROUND

5.      fuboTV was created in 2015 by co-founder and current Chief Executive Officer ("CEO"), Defendant David Gandler ("Gandler"), as an online pay TV service for soccer fans.  The commonly used industry term for fuboTV's business is "vMVPD" which stands for virtual multichannel video programming distributor – a nod to how its business model is similar to that of traditional facilities-based cable, satellite, and telecom content distributors.

6.      The "virtual" label refers to the lack of physical infrastructure.  fuboTV does not own or operate a network.  It delivers its service over the public internet through the subscriber's

existing broadband connection.  fuboTV does not own or produce any material amount of content. It licenses for distribution a bundle of TV networks owned by the likes of Disney, Fox, CBS, and many others.

7.      Subscribers can access fuboTV through various streaming platforms like Roku using a player or device as well as through internet connected TVs.  Like all other vMVPDs, FuboTV offers service without a contract.  The main marketed service plan is the Family Plan which starts at $64.99 per month (similar to peers).  fuboTV's strategy is to attract cord-cutting sports fans with a price point below that of cable and satellite and with a line-up that delivers more live sports than competitors.  fuboTV competes directly against services supported by deep-pocketed corporate parents such as SlingTV (Dish), Hulu Live (Disney), YouTubeTV (Google), AT&T TV Now.

8.      fuboTV began as a $6.99 per month subscription offering live streams from soccer-centric channels such as GolTV and Benfica TV and emphasizing tournaments like the Copa America.  Originally, half of fuboTV's programming was in Spanish.  It was a unique product.  A "skinny bundle" which targeted an audience underserved by U.S. broadcasters who, when it came to soccer, were pre-occupied with delivering higher-profile English Premier League and FIFA World Cup matches.  In 2016, fuboTV expressed confidence in attracting 1 million subscribers three to four years later.

9.      They have failed to meet that goal.

10.     In early 2017, Defendant Gandler changed the business model.  In order to attract and retain more than just die-hardsoccer fans, fuboTV needed to carry more mainstream content and during the course of the year, struck agreements with Fox, CBS and NBC for a broader package of TV channels.  While this decision set fuboTV on a path for broader acceptance, it was

also one that had irreversible, negative consequences.

11.    The attraction of Defendant Gandler's original strategy was that second-tier soccer and news were relatively inexpensive and needed to be consumed live.  Defendant Gandler's decision to chase scale by signing agreements for more mainstream content meant the business would be subjected to more of the same pressure points found in the very industry, traditional pay TV, he was trying to disrupt.  Due to the existence of contractual MFN clauses embedded in the contracts of all major distributors, Fox cannot sell only one sports network like FS1 to FuboTV (assuming it even wanted to).  fuboTV must take a whole package, which includes less desirable general entertainment channels, all of which can be watched on-demand these days.  This enlarging of the original skinny bundle put fuboTV on a path of needing to endlessly raise costs to attempt to preserve margin.

12.    By pivoting into major sports and entertainment, fuboTV surrendered flexibility of the bundles it can create and the prices it can charge.  fuboTV's base package prices have increased at a 22% CAGR from approximately December 2017 to December 2020 and the subscription still was not generating positive contribution margins.  *See* Chart[1] below:

---

[1]    *See* https://www.kerrisdalecap.com/wp-content/uploads/2020/12/fuboTV-Inc.-FUBO.pdf.



*Source: Third party data analytics provider*

13.    The Chart above is a measure of the relative change in global fuboTV app downloads indexed to an August 1, 2019 start date.  The graph line illustrates the seasonal, event-driven nature of abusiness like fuboTV's that focuses on live sports and has no contracts

14.    Following the conclusion of the 2020 Presidential election, downloads have substantially declined.  Rather than the start of a new "megatrend," the data above suggests fuboTV benefited from the never-to-be repeated jam-packed nature of the 3Q sports calendar and historic news cycle.

15.    The 3Q 2020 was the best quarter for sports TV ever.  The NFL is the most watched sport in the U.S. and every year as the start of the season approaches, fuboTV ramps marketing spend to attract new subscribers and encourages former subscribers to reactivate.  It is the most important period for the Company all year.  In the last two years (this year will be no different), all the annual subscriber gains were effectively accounted for in the third quarter; with modest sequential gains in 4Q offset by losses during the seasonally weakest first half of the year.

16.     In 3Q 2020, owing to the disruption to the sports calendar caused by Covid-19, an unusually active September 2020 helped drive record subscriber additions. Instead of spring training beginning in March, MLB began an abbreviated 60 game baseball season in July.  College football, which typically begins in late August, began this year in late September.  The Masters golf tournament usually held in the 1st or 2nd week of April was held this year on November 12th. Instead of April to June, the NHL held the Stanley Cup playoffs from August to late September. The NBA playoffs, also usually in June, began in mid-August and concluded early October.

17.     All four major US professional sports and college football have never overlapped in this manner.

18.     In addition, the news cycle was dominated by the end of a highly contested and controversial Presidential election year.

19.     To be clear, the 3Q quarter is always the best quarter for fuboTV to add downloads. But to downplay the contribution of the one-time effect the pandemic had on the sports calendar, and to claim that fuboTV's better-than-expected performance represents sustainable, structural change is false.

**FUBOTV FUNDED LOSSES BY SELLING
EVER-INCREASING AMOUNTS OF PREFERRED STOCK**.

20.     In 2016, the Company issued a $15 million Series B round of funding.  Then, the Company issued a $37 million Series C round of funding.

21.     Next, in 2018, the first full year after fuboTV began trying to handle a mainstream content business model, fuboTV needed to raise another $46 million in a Series D round, with a further $25 million loan from AMC Networks.

22.     In 2019, after yet more losses, fuboTV issued a $102 million in a Series E round of funding.

23.     fuboTV was growing subscribers but continuing to lose large amounts of money.

| Ever Growing Funding Needs | | | | | |
|---|---|---|---|---|---|
| | December 31, 2019 | | | | |
| | Shares Authorized | Shares Issued and Outstanding | Net Proceeds | Liquidation Preference per Share | Liquidation Value |
| Series AA convertible preferred stock | 1,641,024 | 1,641,024 | $ 1,600 | $ 0.9750 | $ 1,600 |
| Series A convertible preferred stock | 1,059,204 | 1,059,204 | 3,065 | 2.9576 | 3,133 |
| Series A-1 convertible preferred stock | 101,430 | 101,430 | — | 2.5140 | 255 |
| Series A-2 convertible preferred stock | 33,721 | 33,721 | — | 2.3661 | 80 |
| Series A-3 convertible preferred stock | 292,562 | 292,562 | — | 1.8201 | 533 |
| Series B convertible preferred stock | 1,926,507 | 1,926,507 | 14,960 | 7.8008 | 15,028 |
| Series B-1 convertible preferred stock | 14,369 | 14,369 | — | 3.4796 | 50 |
| Series C convertible preferred stock | 2,495,291 | 2,495,291 | 37,446 | 16.0302 | 40,000 |
| Series C-1 convertible preferred stock | 1,600,000 | 1,543,051 | — | 10.0635 | 15,528 |
| Series D convertible preferred stock | 2,173,990 | 1,839,954 | 46,294 | 25.3000 | 46,551 |
| Series D-1 convertible preferred stock | 1,140,481 | 1,140,481 | — | 20.2400 | 23,083 |
| Series E convertible preferred stock | 4,667,595 | 3,056,951 | 101,699 | 29.7354 | 90,898 |
| Series E-1 convertible preferred stock | 471,100 | 471,100 | — | 23.7883 | 11,207 |
| Total | 17,617,274 | 15,615,645 | $ 205,064 | | $ 247,946 |

See https://www.kerrisdalecap.com/wp-content/uploads/2020/12/fuboTV-Inc.-FUBO.pdf.

24.     At the end of 2019, fuboTV was in deep financial trouble.  fuboTV ended the year with $15.6 million in cash, just enough, upon information and belief, to fund one quarter of negative of cash burn.

25.     In 1Q 2020, after dropping Sinclair RSNs, fuboTV expended $15.0 million.  *See* https://www.sportspromedia.com/news/sinclair-fox-rsns-fubotv-nba-mlb-nhl.

26.     Defendant Gandler needed to find two things quickly: (1) immediate liquidity to keep fuboTV operating and (2) eventual access to much more capital, *i.e.*, the public markets.

27.     Defendant Gandler did not have time to find an ideal partner nor would he be able to launch an Initial Public Offering ("IPO").

28.     On March 19, 2020, fuboTV agreed to merge with FaceBank Group.

29.     FaceBank Group was a provider of "hyper-realistic digital humans" best known for a hologram of Tupac at Coachella in 2012.  The press release announcing the deal stated: "The proposed merger is expected to create a leading digital entertainment company, combining

fuboTV's direct-to-consumer live TV streaming platform for cord-cutters with FaceBank's technology-driven IP in sports, movies and live performances." *See* https://www.businesswire.com/news/home/20200323005155/en/FaceBank-Group-and-fuboTV-Announce-Definitive-Merger-Agreement---Combined-Company-to-Be-Named-fuboTV-Inc.

30.     The release also touted a subsidiary of FaceBank, describing how "the merger will position fuboTV to continue its global expansion with FaceBank's Nexway AG, a global ecommerce and payment platform with a business presence in 180 countries." *See* https://www.businesswire.com/news/home/20200323005155/en/FaceBank-Group-and-fuboTV-Announce-Definitive-Merger-Agreement---Combined-Company-to-Be-Named-fuboTV-Inc.

31.     Nexway, has a one-star rating from the BBB, which reviewed it in January 2020 after receiving consumer complaints that it was a scam. *See* https://www.kerrisdalecap.com/wp-content/uploads/2020/12/fuboTV-Inc.-FUBO.pdf

32.     Less than 6 months after closing the merger, fuboTV sold FaceBank back to its former owner.

33.     As part of the merger, fuboTV received a much needed $10 million upon closing. The merger agreement also lays out what would take place later in the year, with shares of FaceBank common stock trading OTC under the ticker symbol "FBNK" until such a time as "FUBO" or another ticker symbol consistent with fuboTV would be confirmed as available for listing on either the Nasdaq or the NYSE.

34.     As part of the merger, FaceBank managed to obtain a purported $100 million secured revolving line credit line.  This would be good in the middle of a pandemic and because both fuboTV and FaceBank had approximately zero cash on hand and had each recently received going concerns letters.  *See* https://sec.report/Document/0001493152-20-015153/.

35.     The lender behind the credit facility is a Luxembourg registered investment holding company identified as HLEE Finance S.a.r.l.

36.     Upon information and belief, HLEE Finance S.a.r.l is not a bank, it generates no income, and the main assets held by the company according to its 2019 annual filing was €12.5 million worth of FBNK shares and €6 million in cash.  *See* https://www.kerrisdalecap.com/wp-content/uploads/2020/12/fuboTV-Inc.-FUBO.pdf

37.     This Luxembourg investment holding company also holds shares of FaceBank.

38.     No legitimate reason is given why HLEE provided a $100 million-secured revolving line of credit:



## HLEE Finance S.a.r.l Financial Assets

**HLEE Finance S.à r.l. f.k.a. SagittariusStar S.à r.l.**

**Notes to the annual accounts as at December 31, 2019 (continued)**

**Note 3 – Financial assets**

a) Shares in affiliated undertakings

On December 4, 2019, the Company acquired 100 nominal shares of Smith Circle Holdings AG, a Swiss company with its registered office at 29 Dufourstrasse, 8008 Zurich, for an aggregate purchase price of CHF 1,00.

b) Securities held as fixed assets

Securities held as fixed assets are composed of the following securities:

| Security Type | ISIN / Ticker | Acquisition cost in EUR |
| --- | --- | --- |
| Stock | CH0003583256 | 4,727,273.00 |
| Stock | FBNK | 12,500,000.00 |
| Bond | DE000A2RYEB8 | 1,500,000.00 |
| **Total acquisition cost** | | **18,727,273.00** |

DBSBUX20200409T10595701_001

RCSL Nr.: B227200     Matricule: 2018 2450 155

| | Reference(s) | | Current year | | Previous year |
| --- | --- | --- | --- | --- | --- |
| III.   Investments | 1190 | | 190 | | 190 |
| 1.   Shares in affiliated undertakings | 1191 | | 191 | | 192 |
| 2.   Own shares | 1200 | | 200 | | 210 |
| 3.   Other investments | 1195 | | 195 | | 196 |
| IV.   Cash at bank and in hand | 1197 | 5 | 197 | 6.008.104,94 | 198 | 7.415,65 |
| E.   Prepayments | 1196 | 2.2.7, 6 | 196 | 137.317,00 | 200 | |
| | | | | | |
| **TOTAL (ASSETS)** | | | 201 | 24.890.611,99 | 202 | 7.415,65 |

*See* https://www.kerrisdalecap.com/wp-content/uploads/2020/12/fuboTV-Inc.-FUBO.pdf

39.     The existence of this secured line of credit was touted in the news concerning the merger.

40.     Upon information and belief, Defendants' primary purpose was to portray that fuboTV had access to future liquidity.

41.     Upon information and belief, fuboTV never drew on the line of credit facility beyond the initial advance at the close of the merger with FaceBank, despite continuing to sell equity and take on expensive borrowings in the months that followed.

42.     In April of 2020, fuboTV obtained a $4.7 million PPP loan to cover payroll.  It then borrowed $10 million from another source known only as Fundigo LLC on May 15th, 2020, repaying it with $3.1 million in interest in less than 4 months.

43.     Between May 11 and June 8, 2020, 3.7 million common shares were sold at $7.00 per share.

44.     In July of 2020, fuboTV borrowed $10 million, this time for 3 months at 13% annual interest.

45.     In August 2020, an additional 5.1 million shares were sold at $9.25 per share.

46.     In October 2020, fuboTV made a common stock offering.

47.     According to Amended Form S-1 at page 143, on December 30, 2020, a total of 68.6 million shares of common stock will become eligible for sale in the public market (equivalent to 1.6x to the then current float).

48.     One week later, an additional 3.3 million shares were freely tradeable.  *See* https://www.kerrisdalecap.com/wp-content/uploads/2020/12/fuboTV-Inc.-FUBO.pdf

49.     The majority of the shares (60.3 million) are related to the conversion of Series AA

Preferred Stock.

50.     A little over half (32 million) are held by strategic content providers such as Disney, AMC Networks, Comcast, Viacom, and Discovery.

51.     Of the 20 million shares labeled in the S-1 as owned by executive officers and directors, two of the largest holders, John Textor and Alexander Bafer were senior executives of FaceBank that left fuboTV months before December 2020. *See* https://s21.q4cdn.com/819998841/files/doc_financials/2020/q3/16be93b6-1b43-471a-a81f-a8b07e43e47c.pdf.

52.     At the time, Textor owned 8.1 million shares and Bafer owned 2.8 million shares.

53.     The reason Defendants emphasize non-existent revenue streams like advertising and sports betting, is because fuboTV's core business of selling pay TV subscriptions is consistently losing money.

54.     fuboTV's revenue stream is shackled by high variable content costs with contracted escalators.  These contracted escalators are paid to a handful of major corporate conglomerates that dominate all major content in the United States and have powerful leverage against fuboTV.

55.     fuboTV's core subscription business is fundamentally different from other young tech companies that post losses because of heavy spending on R&D or sales and marketing.  Those companies have the ability to drive operating leverage off of investments as the business scales.

56.     fuboTV's subscription business loses money at the actual subscription level - ***before*** the cost to acquire the subscriber, infrastructure, and G&A.

57.     Each fuboTV incremental subscriber comes with approximately $62.00 in variable costs per subscriber per month.

58.     In 1Q 2021, the cost to fuboTV was increased due to contracted annual escalators.

59.     On December 1, 2020, fuboTV issued a press release stating "fuboTV Acquires Balto Sports as First Step Into Online Sports Wagering Market."   *See* https://www.businesswire.com/news/home/20201201006185/en/fuboTV-Acquires-Balto-Sports-as-First-Step-Into-Online-Sports-Wagering-Market.

60.     Defendants failed to mention that Balto had 3 employees, a failed test product, and had mothballed operations during the pandemic.

61.     Defendants' effort to promote this move as an "instrumental" expansion of fuboTV's sports betting ambitions is false and misleading.

62.     This December 1, 2020 press release was also false and misleading because in May 2019, fuboTV announced a partnership that named FanDuel its "exclusive sportsbook, online casino, horse racing and DFS partner."   *See* https://techcrunch.com/2019/05/23/fanduel-partners-with-fubotv-to-bring-sports-betting-data-to-the-live-streaming-service/

63.     Upon information and belief, that partnership with FanDuel was terminated after only a year for reasons that have never been publicly provided.   *See* https://www.kerrisdalecap.com/wp-content/uploads/2020/12/fuboTV-Inc.-FUBO.pdf.

64.     In the days that followed, several research firms, including bookrunners and co-managers on the October 2019 public offering, raised price targets and began incorporating valuations for a completely non-existent sports-betting business.   *Id.*

65.     It is cost prohibitive for fuboTV to try to become a sports-betting business.  It would take hundreds of millions of dollars in technology, marketing, and licensing – cash that fuboTV would have to raise in the market to simply get sports-betting operations started.

66.     Upon information and belief, in Illinois, it costs $20 million to get a license before even taking a dollar of revenue.   *See* https://www.legalsportsreport.com/35959/illinois-sports-

betting-takes-step-forward/.

67.     Upon information and belief, in New York, all the potential online sports betting slots are already filled.  *See* https://www.playny.com/new-york-online-sports-betting-skins/.

68.     As the only current source of high margin revenue, fuboTV's profitability is tied directly to its ability to sell more advertising at higher rates (CPMs) using its Connected TV (CTV) subscribers.

69.     Upon information and belief, across the industry, average CTV CPMs, have been declining the past two plus years and are expected to be flat in the coming years, as a large increase in ad inventory will be matched by demand.  With nothing special to differentiate itself, fuboTV does not have any leverage to meaningfully improve its pricing.

70.     fuboTV's number of subscribers, while expensive to on-board, are too small in numbers to be profitable and fuboTV is merely a content aggregator, not a content producer.

71.     For example, Hulu's ownership of content, its ability to deliver massive reach, its direct relationships with brands and advertisers all contributes to its ability to sell out of advertising inventory, which in turn allows it to charge a premium for its advertising space.  fuboTV has no ability to do any of this.

## PARTIES

### Plaintiff

72.     ***Plaintiff Robert Rosenfeld*** ("Plaintiff") first acquired fuboTV common stock on February 25, 2020 when the entity was known as FaceBank, and before FaceBank's reverse merger with fuboTV. Plaintiff intends to continue to hold fuboTV common stock throughout the pendency of this action.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.  Plaintiff is a citizen of Nevada.

**Nominal Defendant**

73.      ***Nominal fuboTV*** is a Florida corporation with a principal place of business at 1330 Avenue of the Americas, New York, NY 10019.  FuboTV shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "FUBO."  Nominal Defendant fuboTV is a citizen of Florida and New York.

74.      On April 1, 2020, fuboTV Acquisition Corp., a Delaware corporation and the Company's wholly owned subsidiary, or Merger Sub, merged with and into fuboTV Media Inc., a Delaware corporation, which was then known as fuboTV Inc., or fuboTV Sub, whereby fuboTV Sub continued as the surviving corporation and became the wholly owned subsidiary pursuant to the terms of the Agreement and Plan of Merger and Reorganization, dated as of March 19, 2020 by and among the Company, Merger Sub and fuboTV Sub, ("Merger").  Following the Merger, the name of the Company, which remains a Florida corporation, changed from "FaceBank Group, Inc." to "fuboTV Inc.," and the name of fuboTV Sub changed from "fuboTV Inc." to "fuboTV Media, Inc."

**Director Defendants**

75.      ***Defendant Edgar Bronfman, Jr.*** ("Bronfman") joined the Board of Directors (the "Board") in May 2020 following the Merger.  On January 21, 2011, a Paris Trial Court found Bronfman, the Executive Chairman and Director of the Company, guilty of a charge of insider trading on trades that Bronfman made in Vivendi Universal stock.  Defendant Bronfman appealed the conviction, and in May 2014, the Paris Court of Appeal affirmed the Paris Trial Court's decision.  Defendant Bronfman appealed the Paris Court of Appeal's decision to the Appellate Court, which rejected his appeal in April 2017.  The final judgment, entered by the Paris Court of Appeal, required Bronfman to pay a 2.5 million Euro fine in connection with the conviction.

Defendant Bronfman is a citizen of New York.

76.     On April 29, 2020, the Company entered into a letter agreement (the "Bronfman Letter Agreement"), with Bronfman pursuant to which Bronfman agreed to serve as Executive Chairman in addition to serving as a member of the Board. The Bronfman Letter Agreement provides that Bronfman's employment as Executive Chairman is for an indefinite period and is terminable by either Bronfman or the Company upon 30 days' advance written notice.  In the event Bronfman's employment with the Company is terminated by the Company without cause, by Bronfman following the Company's material breach of any agreement between Bronfman and the Company or due to Bronfman's death or disability, any outstanding portion of his option awards that remains unvested as of the date of such termination of employment will remain outstanding and eligible to vest in accordance with the terms of the applicable stock option agreement. In addition, any unvested portion of the option awards that remains outstanding as of the date of a change in control of the Company will immediately vest in full and become exercisable.

77.     In May 2020, the Company sold shares of its common stock at $7.00 per share and issued warrants to purchase the Company common stock with an exercise price of $7.00 per share to the following related persons: 285,714 shares of the Company's common stock and a warrant to purchase 285,714 shares of common stock to Waverley Capital, L.P. ("Waverly Capital"), an entity controlled by Bronfman, the Company's Executive Chairman and a Director of the Company and Daniel Leff, a Director of the Company, for gross proceeds of $1,999,998.00.

78.     Defendant Bronfman owns 3,649,725 shares of fuboTV.  Of this total amount, 2,338,954 shares of common stock issuable pursuant to options are held directly by Bronfman exercisable within 60 days of October 26, 2020.  This also includes (i) 285,714 shares of common stock held directly by Waverley Capital and (ii) 285,714 shares issuable upon exercise of a warrant

held directly by Waverley Capital and exercisable within 60 days of October 26, 2020.  According to information provided to the Company by Waverley Capital, the general partner of Waverley Capital is Waverley Capital Partners, LLC.  Bronfman and Leff, as managing members of Waverley Capital Partners, LLC, may be deemed to have shared voting and investment power with respect to these securities.  The address for Waverley Capital is 535 Ramona Street, Suite #8, Palo Alto, CA 94301.

79.     Defendant Bronfman is Co-Founder, Chairman and General Partner of Waverley Capital LLC.  Defendant Bronfman is also Senior Advisor and Special Limited Partner of Luminari Capital and Managing Partner at Accretive, LLC.

80.     Waverley Capital is a venture capital firm focused solely on the innovation and disruption occurring globally throughout the media and entertainment industries.  Waverley Capital is led by its co-founders (Bronfman and Leff), who claim to collectively possess decades of experience investing in, growing, and operating category-defining media start-ups as well as assisting them in transition to public ownership.  Their previous investments include: (i) Roku, Inc. (IPO – NASDAQ: ROKU); (ii) fuboTV Inc. (IPO – NYSE: FUBO); (iii) Matterport (SPAC merger announced – NASDAQ: GHVI); (iv) Pluto TV (acquired by Viacom); (v) Wondery (acquired by Amazon); (vi) The Athletic; and (vii) Headspace.   Defendant Bronfman has also been foundationally involved with Warner Music Group and Universal Studios Inc., serving as Chairman and CEO of both companies, as well as with Fandango, and serving as a partner at Accretive, Waverley Capital's founding venture investor.  Waverley Capital is the successor fund to Luminari Capital L.P. ("Luminari"), a media-focused venture capital fund founded in 2014.

81.     **Defendant Daniel Leff** ("Leff") joined the Board in July 2020.  Defendant Leff is the Chairman of the Nominating and Corporate Governance Committee.  Defendant Leff is also a

member of the Audit Committee.  Defendant Leff is Co-Founder and Managing Partner of Waverley Capital.  Defendant Leff is also Founder and Managing Partner of Luminari.  Defendant Leff is a citizen of California.

82.    In October 2020, the Company sold 200,000 shares of its common stock in a public offering, for an aggregate of $2,000,000 at the public offering price of $10 per share, to Waverley Capital.

83.    Defendant Leff served on the board of directors of fuboTV pre-merger from May 2015 until March 2020, immediately prior to the Merger.

84.    The address for Luminari, Waverley Capital and WL fuboTV[2] is 535 Ramona Street, Suite #8, Palo Alto, CA 94301.

85.    Defendant Leff was elected to the Board by the holders of Series AA Preferred Stock.  Defendant Gandler owns 4.91% of the outstanding Company AA Preferred Stock; Defendant Bronfman owns 8.25% of the outstanding Company AA Preferred Stock; and Defendant Leff owns 8.18% of the outstanding Company AA Preferred Stock.

86.    ***Defendant David Gandler*** ("Gandler") was appointed as the Company's Chief Executive Officer ("CEO") and Director in April 2020 upon the closing of the Merger.  Defendant Gandler previously served as President and Chief Executive Officer of fuboTV pre-merger and as a member of fuboTV pre-merger's board of directors from March 2014 to April 2020.  Defendant Gandler is a citizen of Connecticut.

87.    Defendant Gandler is also a member of the board of directors, along with

---

[2]    The general partner of WL fuboTV is WL fuboTV GP, LLC.  Defendants Bronfman and Leff are managing members of WL fuboTV GP, LLC.

Defendants Bronfman and Leff, of Waverly Capital Acquisition Corp. 1.[3]

88.  **Defendant Henry Ahn** ("Ahn") joined the Board in July 2020.  Defendant Ahn is a member of the Audit Committee and Compensation Committee.  Defendant Ahn was formerly a board observer of fuboTV pre-Merger.  Defendant Ahn is a citizen of Florida.

89.  **Defendant Ignacio Figueres** ("Figueras") joined the Board in August 2020. Defendant Figueres is a resident of Argentina.

90.  **Defendant Laura Onopchenko** ("Onopchenko") joined the Board in September 2020.  Defendant Onopchenko is the Chairman of the Audit Committee.  Defendant Onopchenko is a citizen of California.

91.  **Defendant Pär-Jörgen Pärson** ("Pärson") joined the Board in May 2020.  Until April 1, 2020, Defendant Pärson served on the Board of fuboTV pre-Merger.  Defendant Pärson is the Chairman of the Compensation Committee.  Defendant Pärson is also a member of the Nominating and Corporate Governance.  Defendant Pärson has been a General Partner of Northzone, a venture capital firm, where his primary areas of focus are disruptive businesses in consumer internet, health, and fintech.  Defendant Pärson is a citizen of New York.

92.  In May 2020, the Company sold shares of its common stock at $7.00 per share and

---

[3]      In 2021, Waverly Capital Acquisition Corp. 1 conducted an initial public offering of 30,000,000 units.  Each unit had an offering price of $10.00 and consisted of one Class A ordinary share and one-fourth of one redeemable warrant.  Each whole warrant entitles the holder thereof to purchase one Class A ordinary share at a price of $11.50 per share, subject to adjustment, terms and limitations. Only whole warrants are exercisable. No fractional warrants will be issued upon separation of the units and only whole warrants will trade. The warrants will become exercisable on the later of 30 days after the completion of its initial business combination and 12 months from the closing of the offering. The warrants will expire five years after the completion of the company's initial business combination or earlier upon redemption or liquidation.  The underwriters have a 45-day option from the date of this prospectus to purchase up to 4,500,000 additional units to cover over-allotments, if any. WCAC1 Sponsor LLC (an affiliate of Waverley Capital, L.P.) agreed to purchase 6,000,000 warrants (or 6,600,000 warrants if the underwriters' over-allotment option is exercised in full), each exercisable to purchase one Class A ordinary share at $11.50 per share, subject to adjustment, at a price of $1.50 per warrant, in a private placement to occur simultaneously with the closing of this offering.  Defendant Leff is the manager of WCAC1 Sponsor LLC.   WCAC1 Sponsor LLC's business address is 535 Ramona Street, Suite #8, Palo Alto, CA 94301.

issued warrants to purchase its common stock with an exercise price of $7.00 per share to the following related persons: 277,008 shares of the Company's common stock and a warrant to purchase 277,008 shares of the Company's common stock to Northzone VIII L.P., an entity that holds 10.90% of the Company's Series AA Preferred Stock as of October 26, 2020, for gross proceeds of $1,939,056.

93.     Defendant Pärson was elected to the Board by the holders of Series AA Preferred Stock.  Defendant Gandler owns 4.91% of the outstanding Company AA Preferred Stock; Defendant Bronfman owns 8.25% of the outstanding Company AA Preferred Stock; and Defendant Leff owns 8.18% of the outstanding Company AA Preferred Stock.  Defendant Pärson is beholden to Defendants Gandler, Bronfman and Leff for his position on the Board

94.     Defendant Pärson, is a General Partner of Northzone, a venture capital firm which is an affiliate of certain record and beneficial owners of more than 5% of the voting power of the Company's AA Preferred Stock.

95.     Defendants Bronfman, Leff, Gandler, Ahn, Figueras, Onopchenko, and Pärson are herein referred to as "Director Defendants."

**Officer Defendant**

96.     ***Defendant Simone Nardi*** ("Nardi") has served as the Company's Chief Financial Officer ("CFO") since May 31, 2020.  Defendant Nardi served as Interim CFO since March 2020.

97.     The Company entered into an employment agreement with Nardi, or the Nardi Employment Agreement, effective May 30, 2020, pursuant to which Nardi agreed to serve as the Company's CFO.  Pursuant to the Nardi Employment Agreement, Nardi will receive an annual base salary of $430,000 per year, subject to increase, but not decrease, at the discretion of the compensation committee of the Board and the CFO.  Nardi will be eligible to receive a target

maximum annual bonus of $235,000, based on the Company achieving certain performance-based objectives, as established by the Company's compensation committee and the CEO.  In the event Nardi's employment with the Company is terminated without Cause or for Good Reason (each as defined in the Nardi Employment Agreement) within 12 months following a change of control, any unvested portion of his option award, described below, that remains outstanding as of the date of a change in control of the Company will immediately vest in full and become exercisable. Further, in the event Nardi's employment with the Company is terminated without Cause or for Good Reason, the Company shall pay Nardi an amount equal to 50% of his then annual base salary, other than bonus, as determined as of the date of termination, and any outstanding portion of incentive awards that remains unvested shall immediately vest.

98.     The Director Defendants and Defendant Nardi are collectively referred to herein as "Defendants".

## THE COMPANY'S CORPORATE GOVERNANCE

99.     As members of the Board, the Director Defendants are held to the highest standards of honesty and integrity and are charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

100.    The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of fuboTV, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

## DUTIES OF THE DIRECTOR DEFENDANTS

101.    By reason of their positions as officers, directors, and/or fiduciaries of fuboTV and because of their ability to control the business and corporate affairs of fuboTV, the Director

Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage fuboTV in a fair, just, honest, and equitable manner.  The Director Defendants were and are required to act in furtherance of the best interests of fuboTV and its shareholders.

102.   Each director and officer of the Company owes to fuboTV and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

103.   The Director Defendants, because of their positions of control and authority as directors and/or officers of fuboTV, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with fuboTV, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of fuboTV.

104.   To discharge their duties, the officers and directors of fuboTV were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of fuboTV were required to, among other things:

(a)     Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     Conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     Remain informed as to how fuboTV conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     Ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

105.    Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the

exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of fuboTV, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

106.    The Director Defendants breached their duties of loyalty and good faith by causing the Company to misrepresent the information as detailed *infra*. The Director Defendants' subjected the Company to the costs of defending, and the potential liability from, the securities class action (and related lawsuits). As a result, fuboTV has expended, and will continue to expend, significant sums of money.

107.    The Director Defendants' actions have irreparably damaged fuboTV's corporate image and goodwill.

## THE AUDIT COMMITTEE CHARTER

108.    The Audit Committee Charter states in relevant part:

The purpose of the Committee shall be to assist the Board in its oversight of:

1.    the accounting and financial reporting processes and internal controls of the Company;

2.    *the audit and integrity of the Company's financial statements*;

3.    the Company's compliance with applicable law (including U.S. federal securities laws and other legal and regulatory requirements);

4.    the qualifications, independence and performance of the Company's independent auditors; and

5.    the implementation and performance of the Company's internal audit function, if applicable.

The Committee shall also be responsible for preparing the report required by the Securities and Exchange Commission (the "SEC") rules to be included in the Company's proxy statement for the annual meeting of stockholders, and for performing other duties and responsibilities as are enumerated in or consistent with this charter.

The function of the Committee is primarily one of oversight. **The Company's management is responsible for preparing the Company's financial statements**, and the independent auditor is responsible for auditing and reviewing those financial statements. The Committee is responsible for assisting the Board in overseeing the conduct of these activities by management and the independent auditor. The Committee is not responsible for providing any expert or special assurance as to the financial statements or other financial information provided by the Company to its stockholders or others or as to the independent auditor's work.

\* \* \*

## RESPONSIBILITIES

The following are the principal recurring responsibilities of the Committee. The Committee may perform other functions that are consistent with its purpose and applicable law, rules and regulations, and as the Board or Committee deem appropriate.  In carrying out its responsibilities, the Committee believes its policies and procedures should remain flexible, in order to best react to changing conditions and circumstances.

\* \* \*

R*eview of Internal Controls and Integrity of Financial Statements*. **The Committee shall meet with management, the internal audit department, if applicable, and the Company's independent auditor to review and discuss the Company's internal controls and the integrity of the Company's audited financial statements**. Included in this process shall be review of:

a.   the scope and timing of the annual audit of the Company's financial statements;

b.   the Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Form 10-K and Form 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations";

c.   the Committee shall make a recommendation to the Board as to whether the audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" should be included in the Company's Form 10-K for filing with the SEC;

d.   the results of the independent audit and the quarterly reviews, and the independent auditor's opinion on the audited financial statements;

e.      the quality and adequacy of the Company's internal controls, and discussion with management and the independent auditor with regard to any significant deficiencies or material weaknesses in the design or operation of, and any material changes in, the Company's internal controls;

f.      the Company's disclosure controls and procedures, as well as the quarterly assessments of such controls and procedures by the Chief Executive Officer and Chief Financial Officer;

g.      any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies;

h.      any analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements;

i.      the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company; and

j.      any audit problems or difficulties the independent auditor encountered in the course of its audit work, including any restrictions on the scope of the independent auditor's activities or on access to requested information, and any significant disagreements with management.

Among the items the Committee shall review with the independent auditor are: Accounting adjustments that were noted or proposed by the auditor but were "passed" (as immaterial or otherwise); any communications between the audit team and the audit firm's national office respecting auditing or accounting issues presented by the engagement; and any "management" or "internal control" letters issued, or proposed to be issued, by the independent auditor.  Such review shall also include discussion of the responsibilities, budget and staffing of the Company's internal audit function when the Company has an internal audit function.

4.      *Review of Financial Information Presentation, Earnings Press Releases and Guidance*.  **The Committee shall periodically discuss with management the Company's procedures with respect to the presentation of the Company's financial information (paying attention to any use of "pro forma" or "adjusted" non-GAAP information) and review earnings press releases, earnings guidance provided to analysts and rating agencies and financial information provided to the public, analysts and ratings agencies**.

5.      *Internal Audit Function*.  The Committee shall, as applicable, oversee the design, implementation and performance of the Company's internal audit function, including by:

a.      reviewing and approving the charter of the internal audit function

and any amendments;

b.    reviewing the responsibilities, functions, qualifications, budget, performance, objectivity, and the scope and results of internal audits […]

(Emphasis added).

## THE FALSE AND MISLEADING STATEMENTS

109.    On March 23, 2020, the Company issued a press release entitled *Facebank Group And FuboTV Announce Definitive Merger Agreement - Combined Company To Be Named FuboTV, Inc.*, which quoted Defendant Gandler regarding the Company's capabilities:

The business combination of FaceBank Group and fuboTV ***accelerates our ability to build a category defining company and supports our goal to provide consumers with a technology-driven cable TV replacement service for the whole family***. With our growing businesses in the U.S., and recent beta launches in Canada and Europe, ***fuboTV is well-positioned to achieve its goal of becoming a world-leading live TV streaming platform for premium sports, news and entertainment content. In the current COVID-19 environment, stay-at-home stocks make perfect sense -*** we plan to accelerate our timing to up list to a major exchange as soon as practicable. We look forward to working with John and his team of creative visionaries.  [Emphasis added].

110.    On April 2, 2020, FaceBank Group and the Company issued a joint press entitled *FaceBank Group and fuboTV Announce Completion of Merger -- Combined Company to Be Named fuboTV, Inc.*, which quoted Defendant Gandler promoting the Company's capabilities:

With today's closing, fuboTV is well-positioned to redefine the virtual MVPD space. Technology-driven cable TV replacement services are more important than ever, especially at this time when people are staying safe at home watching television for needed information, entertainment and escape.

111.    On May 29, 2020, the Company (still operating under the name FaceBank Group, Inc.) filed its yearly report on Form 10-K with the SEC for the fiscal year ended December 31, 2019 (the "2019 Annual Report"). The 2019 Annual Report was signed by Defendants Gandler and Bronfman pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), wherein

Defendant Gandler certified that "the [2019 Annual Report] does not contain any untrue statements of a material fact" and that "the information included in the [2019 Annual Report] fairly presents, in all material respects, the financial condition and results of operations and cash flows of the [Company]" in compliance with Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934."

112.   For the audited financial statements approved for use in the Annual Report on Form 10-K for the fiscal year ended December 31, 2019, filed May 29, 2020, the entire Board functioned as the Company's audit committee.  The Company's audit committee was formed on August 6, 2020.  For the restated audited financial statements approved for use in the Annual Report on Form 10-K/A (Amendment No. 1) for the fiscal year ended December 31, 2019, filed August 11, 2020, the audit committee and the Board discussed the restated audited financial statements, which the Board approved.  Defendants Gander, Bronfman and Pärson were signatories to the aforesaid Form 10-K.

113.   The 2019 Annual Report touted the synergies FaceBank Inc. and fuboTV purportedly created:

> The Company is a leading digital entertainment company, combining fuboTV's direct-to-consumer live TV streaming platform with FaceBank's technology-driven IP in sports, movies and live performances. ***This business combination, operating as fuboTV, Inc., will create a content delivery platform for traditional and future-form IP. fuboTV plans to leverage FaceBank's IP sharing relationships with leading celebrities and other digital technologies to enhance its already robust sports and entertainment offerings***.

> Since the Merger, while we continue our previous business operations, we are principally focused on offering consumers a leading live TV streaming platform for sports, news and entertainment through fuboTV. fuboTV revenues are almost entirely derived from the sale of subscription services and advertising in the United States, though fuboTV has started to assess expansion opportunities into international markets, with operations in Canada and the launch in late 2018 of its first ex-North America offering of streaming entertainment, to consumers in Spain. [Emphasis added].

114.    The 2019 Annual Report also reported the following regarding the Company's Critical Accounting Policies:

*Acquisitions and Business Combinations*

**The Company allocates the fair value of purchase consideration issued in business combination transactions to the tangible assets acquired, liabilities assumed, and separately identified intangible assets acquired based on their estimated fair values.**  The excess of the fair value of purchase consideration over the fair values of these identifiable assets and liabilities is recorded as goodwill. Such valuations require management to make significant estimates and assumptions, especially with respect to intangible assets.  Significant estimates in valuing certain intangible assets include, but are not limited to, future expected cash flows from, acquired technology, trade-marks and trade names, useful lives, and discount rates.

Management's estimates of fair value are based upon assumptions believed to be reasonable, but which are inherently uncertain and unpredictable and, as a result, actual results may differ from estimates.  During the measurement period, which is one year from the acquisition date, we may record adjustments to the assets acquired and liabilities assumed, with the corresponding offset to goodwill. Upon the conclusion of the measurement period, any subsequent adjustments are recorded to earnings.  [Emphasis added].

115.    On July 6, 2020, the Company (under the name FaceBank) filed its quarterly report on SEC Form 10-Q for the first fiscal quarter 2020 ("1Q 2020 Report").  Attached to the 1Q 2020 Report were signed SOX Certifications, wherein Defendants Gandler and Nardi certified that "the [1Q 2020 Report] does not contain any untrue statements of a material fact" and that "the information included in the [1Q 2020 Report] fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]" in compliance with Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934."

116.    In connection with the 1Q 2020 Report, the Company issued a press release, summarizing the Company's financial and operational results, as well as a letter to shareholders released on July 8, 2020 from Defendant Gandler.  In the letter to shareholders, Defendant Gandler

reported the Company's strategy and focus:

> *We believe fuboTV is at the forefront of the streaming revolution and has a significant advantage not only over peers in the vMVPD space but also over traditional cable television.* We offer cord-cutters a total cable TV replacement with top Nielsen-ranked sports, news and entertainment channels. *What sets fuboTV apart is our internally built tech stack that keeps us innovating ahead of the industry.* With premium features like 4K streaming, personalized live TV recommendations and recent app updates that integrate live video into the product experience, *we believe a fuboTV subscription offers consumers the best value of any other live TV streaming platform*. We believe consumers will continue to choose streaming over traditional pay television because of this more personalized, premium viewing experience that is also less expensive.
>
> fuboTV had an extremely productive Q1, despite a complete shutdown of sports, *and we have made several significant recent announcements that highlight the competitive strength of our company and further differentiate us in the marketplace*. While we expect that the COVID-19 pandemic will have lasting effects on consumer behavior and live television viewing, vMVPDs are also a more affordable alternative to pay TV, which, we believe, in this current economic climate, further accelerates adoption. *We believe we are well positioned as a leader in the industry.*  [Emphasis added].

117.    On August 10, 2020, the Company changed its name to fuboTV Inc. and as of May 1, 2020, the Company's trading symbol was changed to "FUBO."

118.    On August 13, 2020, the Company filed its quarterly report on SEC Form 10-Q for the second fiscal quarter 2020 ("2Q 2020 Report").  Attached to the 2Q 2020 Report were signed SOX Certifications, wherein Defendants Gandler and Nardi certified that "the [2Q 2020 Report] does not contain any untrue statements of a material fact" and that "the information included in the [2Q 2020 Report] fairly presents, in all material respects, the financial condition and results of operations and cash flows of the [Company] in compliance with Section13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934."

119.    In connection with the 2Q 2020 Report, the Company issued a press release, summarizing the Company's financial and operational results.  The press release quoted Defendant Gandler:

29

We believe consumers will continue to choose streaming over traditional pay television, especially in the current economic climate because of its more personalized, premium viewing experience. ***Macro trends towards streaming, combined with our strong second quarter results and continued momentum, reinforce our confidence in our business and the vMVPD space***. Looking ahead to Q3, with the gradual return of sports, we anticipate an increase in subscribers, viewership and that our portion of revenue derived from advertising will grow. At the close of Q3 we expect paid subscribers to reach 340,000 - 350,000, which will be an increase of 20% year-over-year. The growth of streaming is one of the most significant changes to television, and television advertising, in the last several decades. ***fuboTV is at the forefront of the streaming revolution and we are excited for existing and new investors to join us on this journey***.  [Emphasis added].

120.    Also, in connection with the 2Q 2020 Report, the Company furnished a letter to shareholders dated August 13, 2020 from Defendant Gandler. In the letter to shareholders, Defendant Gandler reiterated that the Company was "at the forefront of the streaming revolution":

The strength of the streaming business during the pandemic is a clear sign that vMVPDs have a bright future. fuboTV's solid second quarter validated our belief that consumers are seeking lower cost alternatives to traditional television. Our streaming hours grew over the prior year despite a near total shutdown of sports.

This is primarily a result of fuboTV's expanded programming offering for the entire family combined with product innovations that deliver a premium viewing experience not available through traditional television.  We expect streaming hours to grow as sports return.

121.    On September 15, 2020, the Company furnished another letter to shareholders addressed from Defendant Gandler, in which Defendant Gandler promoted the Company's business model and future growth strategy:

***[W]e continue to believe fuboTV is at the forefront of the streaming TV revolution. fuboTV is the leading sports-first, live TV streaming platform***, offering subscribers access to tens of thousands of live sporting events annually as well as leading news and entertainment content. We offer a broad mix of 100+ channels, including 43 of the top 50 Nielsen-ranked networks across sports, news and entertainment (Primetime A18-49), making fuboTV a leading cable TV replacement product for the entire household.  Our retention rate has remained high during the pandemic as customers have found a diverse range of content on the platform to satisfy their needs.

***At the core of our offering is our proprietary technology platform optimized for***

*live TV and sports viewership*.  Our proprietary technology stack has enabled us to regularly offer new features and functionality. For example, we were the first virtual multichannel video programming distributor (vMVPD) to stream in 4K resolution.  We also offer multi-view on Apple TV, which enables subscribers to watch two live streams simultaneously, as well as the ability to watch select sports content from multiple camera angles.

* * *

*Furthermore, we believe fuboTV's sports package is unparalleled in the marketplace*.  fuboTV offers more than 50,000 live sporting events each year and is the only vMVPD streaming 11 Thursday Night Football (FOX) games in 4K this season. The start of the NFL season has been significant for fuboTV. It's been widely publicized that television ratings declined nearly 13% for the NFL's 2020 Kickoff Game on Thursday, September 10. fuboTV, on the other hand, has achieved record viewership with our NFL carriage.  *On Sunday, September 13, our viewing hours doubled year-over-year and reached one million hours for the first time. Cord-cutters are clearly embracing streaming platforms for sports viewing*.  [Emphasis added].

122.    Defendant Gandler summarized the Company's performance and strategy: "fuboTV continues on the path of solid growth with double digital revenue and subscriber increases year-over-year [and are] confident in the continued strength of our business . . . ."

123.    On August 11, 2020, the Company filed with the SEC a Registration Statement on Form S-1 signed by Defendants Gandler, Nardi, and Bronfman, relating to the proposed follow-on public offering of its common stock.  On September 15, 2020, October 1, 2020, and October 5, 2020, the Company filed revised versions of the Registration Statement on Forms S-1/A, each of which was signed by Defendants Gandler and Nardi. On October 7, 2020, the Registration Statement was declared effective by the SEC.  The Registration Statement was incorporated into and formed part of the Prospectus filed on October 9, 2020.

124.    The Company offered to sell to the public 18.3 million common shares (excluding the underwriters' option to purchase an additional 2.75 million common shares), for $10 per share. The Company closed its public offering of 19,706,708 common stock on October 13, 2020,

including the full exercise of the underwriters' option, generating $197 million in gross offering proceeds.

125.   The Prospectus Summary contained materially false and misleading statements concerning the Company's business model:

> Our business model is 'come for the sports, stay for the entertainment.' ***This translates to leveraging sporting events to acquire Subscribers at lower acquisition costs, given the built-in demand for sports. We then leverage our technology and data to drive higher engagement and induce retentive behaviors such as favoriting channels, recording shows, and increasing discovery through our proprietary machine learning recommendations engine. Next, we look to monetize our growing base of highly engaged subscribers by driving higher average revenue per user (ARPU).***   [Emphasis added].

126.   The Registration Statement identified the Company's "Competitive Strengths," which purportedly contributed to the Company's past revenue and subscriber growth:

> ***Our Competitive Strengths***
>
> We believe that fuboTV Pre-Merger's revenue and subscriber growth are a result of the following competitive strengths:
>
> - ***Comprehensive Sports, News & Entertainment Offering.*** While we continue to attract consumers with our extensive premium sports content, we believe our increasingly broad and deep news and entertainment content offerings enhances total viewership and retention of our users as a pay TV replacement.  We believe we will continue to optimize our content offering by identifying and executing strategic deals that best suit our consumers' preferences.
>
> - ***Delivering Significant Value to Our Subscribers.*** We seek to provide a flexible product offering, delivering leading bundles for consumers that best meet their target price point. fuboTV's base package is less expensive than traditional cable or satellite options and includes a broad array of 100+ channels across sports, news and entertainment.
>
> - ***Proprietary Technology and First-Party Data***. Because we design, develop and operate all core segments of our platform, we are able to capture and analyze how our subscribers engage our offering. These unique data insights allow us to better understand and continually adjust our product and strategy to better meet the needs of our subscribers.

- ***Intuitive User Experience.*** We are continuing to innovate to give subscribers a premium viewing experience that they are unable to find with cable TV and are regularly first-to-market with new product features. Our product is highly customizable and provides an optimized experience for personalized live streaming, including capabilities such as unique user profiles, multiple angle and screen viewing for sports, favorites lists, a dynamic recommendation engine and Cloud DVR offerings.

- ***Efficiency of Cloud-based OTT model.*** fuboTV's capital-efficient cloudbased OTT model doesn't require us to devote capex to procuring, maintaining inventory of and delivering superfluous, and often outdated, proprietary set-top boxes to customers that do not want or need them. Furthermore, our proprietary technology infrastructure is highly scalable, which we expect to provide ongoing cost and margin advantages as we grow.

127.   Regarding the Company's growth, the Registration Statement provided:

Our growth strategy is to acquire subscribers who are attracted to our premium sports offering and can find with us a compelling sports, news and entertainment viewing alternative to a traditional pay TV service.  We actively engage those subscribers by providing a seamless pay TV replacement through a personalized easy-to-use streaming product at a significantly lower cost than traditional pay TV providers. We then monetize our engaged audience through subscription fees and our digital advertising offering.  ***Today, the vast majority of our revenue is generated from monthly subscriptions.***  We have improved our margins, as well as our engagement levels, by enabling subscribers to select attachments such as Cloud DVR Plus and Family Share and to subscribe to premium channel packages like Sports Plus with NFL RedZone and International Sports Plus. ***We believe a significant opportunity for fuboTV is to allow advertisers to access our audience by leveraging our technology, data, and measurability to drive returns on advertising spend.***  [Emphasis added].

128.   The Registration Statement highlighted the Company's purported success in growing advertising revenue:

***Advertisers***

We believe our leading, independent live TV streaming platform offers a unique opportunity to advertisers. As cord cutting continues and traditional linear TV viewers decline, advertisers are increasingly allocating their ad budgets to OTT platforms to reach these audiences. fuboTV's sports-first live TV platform offers advertisers a growing and increasingly valuable live audience and provides un-skippable ad inventory on high quality content.  We believe our growing subscriber base and increasing household viewing hours makes the platform highly attractive to advertisers.  Advertisers also benefit from combining traditional TV advertising

formats with the advantages of digital advertising including measurability, relevancy and interactivity.

129.    The Registration likewise stated: "We believe our premium content and industry leading consumer experience uniquely position us to rapidly grow our advertising business."

130.    On August 11, 2020, the Company filed Annual Report on Form 10-K/A (Amendment No. 1) for the fiscal year ended December 31, 2019.  Six members of the Board (Gandler, Bronfman, Figueras, Pärson, Leff and Ahn) also approved the inclusion of the restated audited financial statements in the Company's Annual Report on Form 10-K/A (Amendment No. 1).

131.    On November 10, 2020, the Company issued a press release announcing the results of its financial performance for its third fiscal quarter ended September 30, 2020.  The press release touted the Company's results, stating that the Company "delivered the strongest quarter in its history and exceeded previously raised guidance with solid growth in revenue, subscription and engagement."   Defendant Gandler reiterated these claims, stating that the Company had "the strongest quarter in FuboTV's history, exceeding targets in all of [its] key metrics."   Further, Defendant Bronfman echoed these positive sentiments, claiming that:

> We believe that fuboTV sits firmly at the intersection of three megatrends: the secular decline of traditional TV viewership, the shift of TV ad dollars to connected TVs and online sports wagering, a market which we intend to enter.  *As a result, we believe our growth opportunities are numerous.  Our optimism in the future of fuboTV and the live TV streaming business has never been stronger.*  [Emphasis added].

132.    In a letter to shareholders, signed by Defendant Bronfman and released on the same day, November 10, 2020, the Company touted its "proprietary data and technology platform" as purportedly being the key to its success and future growth:

> *Our financial model is driven by strong unit economics.  We expect margin improvement to continue over time, aided by a number of initiatives. This*

***includes the growth of advertising on our platform along with strong attachment rates on value-added services***, such as cloud DVR storage and the ability to stream on multiple devices.

We believe fuboTV sits firmly at the intersection of three industry megatrends: the secular decline of traditional TV viewership, the shift of TV ad dollars to connected TVs and online sports wagering. ***Our strong subscriber growth indicates consumers are cutting the cord faster than ever before, and our increased viewer engagement has driven fuboTV's ad sales growth.***

We've previously said that we see the online wagering space - a market expected to reach $155 billion by 2024 according to Zion Market Research - as complementary to our sports-first live TV streaming platform. We believe there is a flywheel opportunity with video content and interactivity. As our cable TV replacement product is sports-focused, we believe a significant portion of our subscribers would be interested in online wagering, creating a unique opportunity to drive higher subscriber engagement and open up additional revenue opportunities. Simply put, we expect wagering will lead to more viewing, and this increased engagement will lead to higher ad monetization, better subscriber retention and a reduction in subscriber acquisition costs.

Therefore, we are excited to announce that fuboTV intends to expand into the online sports wagering market. ***Our goal with wagering is to develop a new revenue stream for fuboTV, and one which we believe will be an important contributor to our business.***

We expect to share more tactical details as appropriate. And, of course, we expect to continue to grow our subscribers which will positively impact any decision we make on wagering.  [Emphasis added].

133.   As to the Company's financial performance, the letter to shareholders provided

certain financial highlights, including information pertaining to its subscription rate and growth,

stating:

- [The Company's] revenues for the third quarter 2020 were $61.2 million, a 47% increase year-over-year on a *pro forma* basis, or +71% excluding licensing revenue from FaceBank AG.  This growth ahead of guidance, was driven by continued subscriber expansion, an increase in subscription Average Revenue Per User (ARPU) and growth of advertising sales:

- Subscription revenue increased 64% year-over-year to $53.4 million.

- Advertising revenue increased 153% year-over-year to $7.5 million.

35

- Paid subscribers at quarter end totaled 455,000, an increase of 58% year over-year.

- Average Revenue Per User (ARPU) per month was $67.70, up 14% year over-year.

- Total content hours streamed by fuboTV users (paid and free trial) increased 83% year-over-year to 133.3 million hours.

- Monthly active users (MAUs) watched 121 hours per month on average in the quarter, an increase of 20% year-over-year.

* * *

- We use adjusted contribution margin to measure the variable costs against subscriber revenue: adjusted contribution margin was positive 16.1% in Q3 2020, up from 0.5% in Q3 2019. *The improvement was driven by growth in subscription ARPU, growth in advertising ARPU and a reduction in the average cost per user (ACPU), mainly driven by lower per-subscriber content expenses*. Q3 2020 adjusted contribution margin benefitted in part from the unusual timing of some content deal negotiations in July. Adjusted for this unusual, one-time impact, the Q3 2020 adjusted contribution margin would have been approximately 10.5%. Please refer to the reconciliation of revenue to adjusted contribution margin in the non-GAAP information in the tables accompanying this letter.  [Emphasis added].

134.    As to the Company's financial guidance, it raised its Q4 guidance, stating that it expected "Q4 revenues to be $80-85 million, a 51% to 60% increase year-over-year.  We also expect to end the fourth quarter with 500,000-510,000 paid subscribers, an increase of 58% to 62% year-over-year."  In addition, the Company represented that expected full year 2020 revenue to be "$244-248 million, an increase of over 65% year-over-year."  And its full year 2021 revenue to be "$415-435 million, an increase of over 70% year-over-year."

135.    The letter to shareholders ended with a summary of the Company's claims of future revenue and subscription growth and promising growth of advertising:

The growth of advertising on our platform along with strong attachment rates on value-added services, such as cloud DVR storage and the ability to stream on multiple devices, continue to improve margins.  Furthermore, we believe fuboTV's differentiation in the marketplace - sports-focused programming and a tech-first

user experience - firmly positions the company for long-term growth.  We are also excited about the potential growth and revenue opportunities around our intended expansion into online sports wagering.

136.    On November 10, 2020, Defendants caused the Company to file a Form 8-K with the SEC announcing its results of operations and financial condition for its third fiscal quarter ended September 30, 2020.  Attached to this Form 8-K was a press release, which included a letter to shareholders from Defendants Gandler and Bronfman.  This letter to shareholders states in relevant part:

> We believe fuboTV sits firmly at the intersection of three industry megatrends: the secular decline of traditional TV viewership, the shift of TV ad dollars to connected TVs and online sports wagering.  Our strong subscriber growth indicates consumers are cutting the cord faster than ever before, and our increased viewer engagement has driven fuboTV's ad sales growth.
>
> We've previously said that we see the online wagering space - a market expected to reach $155 billion by 2024 according to Zion Market Research - as complementary to our sports-first live TV streaming platform. We believe there is a flywheel opportunity with video content and interactivity. *As our cable TV replacement product is sports-focused, we believe a significant portion of our subscribers would be interested in online wagering*, creating a unique opportunity to drive higher subscriber engagement and open up additional revenue opportunities. Simply put, *we expect wagering will lead to more viewing, and this increased engagement will lead to higher ad monetization, better subscriber retention and a reduction in subscriber acquisition costs*.
>
> Therefore, *we are excited to announce that fuboTV intends to expand into the online sports wagering market. Our goal with wagering is to develop a new revenue stream for fuboTV, and one which we believe will be an important contributor to our business*.  [Emphasis added].

137.    On the same day, November 10, 2020, the Company hosted an earnings call with the analysts to discuss its financial results and operations.  During the call, Defendant Gandler touted the Company's results:

> And from an execution standpoint Q3 was by far the strongest quarter in the company's history. Our results have exceeded previously raised guidance with solid growth across every KPI we track. Revenues were up 47% to $61 million, that's well ahead of the guidance range we provided $52 million to $55 million.

Our business is really comprised of two components. Subscription revenue which was up 64%, and advertising revenue, which was up in amazing 153%. Ad revenue for the quarter exceeded 12%, and to put that into context 2019 Ad revenue represented roughly about 8%.

So you can see why we're so excited about the quarter and about our guidance in Q4 and for full-year 2021. Paid subscribers are quite a rental the 455,000 and that's 58% above the 288,000 last year. Net additions came in at 167,000 that's up almost 100% year-over-year.

* * *

And advertising sales, which I've already highlighted earlier, clearly plays an important role in margin expansion. At the end of the day, we made some really bold moves in the quarter and that really speaks to our ability to leverage our proprietary data. And so it also speaks to our the quality of our execution. As you all know, it's tough to expand margins while growing your sub base at this current pace.

138.   Regarding the Company's future growth, Defendant Gandler assured the market

that the Company was positioned for future growth due to tailwinds from "three mega trends":

> ***The tailwinds have never been stronger. Fubo is firmly at the intersection of three mega trends. The first is the secular decline of traditional television viewership. The second is the shift of TV ad dollars to connect the devices. And the third is online sports wagering a market we absolutely intend to enter***.

> ***Our growth opportunities are numerous, and there are a great many reasons for us to be optimistic given the optionality in the business.*** Since some of you are new to the story, it might be helpful for me to provide a quick background on who we are. In 2015, we found it Fubo introducing a live streaming platform to serve the needs of U.S. soccer fans, that we're unable to watch international soccer leaks. We quickly learned the soccer fans wanted three things: they wanted a greater breadth of sports and entertainment content; they wanted an intuitive user experience; and they, of course, wanted exceptional value. [Emphasis added].

139.   Once again, Defendant Gandler touted the Company's proprietary data and

technology and assured investors of improved retention, which was purportedly due to the

Company's differentiated offering and personalized premium viewing experience:

> Supporting our offerings is our proprietary data and technology platform that really optimized for live TV and sports, our platform has enabled us to regularly offer new features and functionality for our subscribers. To the best of my knowledge

we are still the only virtual MVPD to stream live sports in 4K.

* * *

We believe our platform offers a more differentiated, a more personalized premium viewing experience for sports fans. And that's really reflected in the recent reports highlighting customer satisfaction relative to our peers. And it also is reflected in our app ratings, and most importantly is reflected in our improving retention.

140.    In response to Evercore ISI analyst, Kevin Rippey's question regarding the Company's plans on expanding sports gambling, Defendant Gandler represented that the Company had "already started executing on its [wagering] strategy" and that it is "going to be able to also sell in a lot of wagering opportunities" given its "acquisitions advantage," "engagement advantage," and "monetization advantage."

141.    On November 16, 2020, the Company filed its quarterly report on SEC Form 10-Q for the third fiscal quarter 2020 ("3Q 2020 Report").  Attached to the 3Q 2020 Report were signed SOX Certifications, wherein Defendants Gandler and Nardi certified that "the [3Q 2020 Report] does not contain any untrue statements of a material fact" and that "the information included in the [3Q 2020 Report] fairly presents, in all material respects, the financial condition and results of operations and cash flows of the [Company] in compliance with Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934."  Neither Balto Sports nor wagering is mentioned in the 3Q 2020 Report.

142.    On December 1, 2020, the Company issued a press release, announcing the acquisition of Balto Sports, a company that develops tools for users to organize and play fantasy sports games.  In the press release, Defendant Gandler promoted the move as an "instrumental" expansion of the Company's sports betting ambitions:

> ***We believe there are significant synergies between consumers who enjoy wagering and our subscribers who enjoy streaming live sports, creating a flywheel opportunity****. As we've previously expressed, one of our goals with

wagering is to expand our total available market (TAM) by developing another important revenue stream for fuboTV, as we are doing with our growing ad sales business.

The acquisition of Balto Sports will enable us to build a first class, free to play experience that brings consumers the best games around live sports. From there, we see a natural progression to layer on real money wagering in regulated markets complementing fuboTV's live streaming video for a highly engaging user experience within our platform. We will be strategic in our approach to wagering as we consider and evaluate different opportunities and will adjust our plans accordingly. We're excited to launch sports wagering, integrate it into our core offerings and deliver what we believe will be a truly groundbreaking live TV streaming platform to consumers.  [Emphasis added].

143.    On December 9, 2020, the Company participated in a BMO Capital Markets 2020 Growth & ESG Conference to give the investors updates on its performance.   During the conference, Defendant Gandler touted the Company's strategy and its use of sophisticated algorithms as purportedly responsible for the surge in viewership:

And so what happened with fubo I think it's really important for us and this is why we have confidence in our strategy is that while we weren't able to acquire anybody, we were really able to retain a lot of people. Viewing hours have gone from something like 120, 121, 123 to about 145 hours. . . . That is an enormous amount of viewing time. So couple takeaways from there.  *One is the strategy works.  We were able to surface more and more content that people like* and I think you hit the nail on the head when you said some people get you at hello, we got your wife in reality TV and *I think this gave us an opportunity to continue to play with our guys to look at our machine learning algorithms and to get people to watch more, which also led to obviously a better advertising conversion.  So that's what we were focused on before the sport season came back*.  [Emphasis added].

144.    When asked about the acquisition of Balto Sports, Defendant Gandler promoted the acquisition, highlighting the synergies between the two companies:

*And so we needed to make sure that this was a team that had a very specific skill set that we did not have, but yet was small enough that we can integrate into our larger group and allow them to leverage the resources and the metadata mapping and things that we think are going to allow us to really build something compelling*.

And so the reason why Balto was because again, they are in the pick'ems game,

they have had, over 30,000 players test the platform. They understand automation. We understand consumer journeys. We understand what we should be looking at from conversion funnels.  And what this is going to allow us to do is launch a game at the end of the, I'll call it, first half of the year 2021. Don't hold me to it, but just say call it, June.  These guys are going to be joining us, I think next week finally. So we're very excited about that. We've been planning.  [Emphasis added].

145.    The Company's positive musings about the acquisition of Balto Sports' worked. Following this news, several securities analysts raised price targets and began incorporating Balto Sports' valuation into fuboTV's own valuation.  However, according to the Kerrisdale Report: "[b]uying Balto Sports was nothing more than buying a TechCrunch article said a former FanDuel executive, and the notion Fubo will ever be a company that owns or operates a sports book is ludicrous."

146.    The above statements identified in ¶¶ 110-145 were materially false and misleading statements and failed to disclose material adverse facts about the Company's business, operational, and compliance policies. Specifically, Defendants made false and/or misleading statements and failed to disclose to investors that: (i) fuboTV's growth in subscriber and profitability were unsustainable past the seasonal surge in subscription levels; (ii) fuboTV offering of products was subject to undisclosed cost escalations; (iii) fuboTV could not successfully compete and perform as a sports book operator and could not capitalize on its only sports wagering opportunity; (iv) fuboTV's data and inventory was not differentiated to allow fuboTV to achieve long-term advertising growth goals and forecasts; (v) fuboTV's valuation was overstated in light of its total revenue and subscription levels; (vi) the acquisition of Balto Sport did not provide the stated synergies, internal expertise, and did not expand the Company's addressable market into online sports wagering; and as a result, the Company's public statements were materially false and/or misleading at all relevant times.

## THE COMPANY'S FALSE AND MISLEADING METRICS

147.    The non-GAAP metrics which the Company disclosed to the market are misleading.

148.    The Company is not close to turning a profit on its streaming video services.

149.    The Company generated revenue of $61.2 million and an operating loss, excluding one-time impairment charges, of $65.5 million in the third quarter of 2020.

150.    FuboTV is not profitable because the direct costs of delivering its service are higher than the revenue which those sales generate.

151.    Subscriber related expenses, which include affiliate distribution rights and cloud computing charges, among other things, were slightly higher than revenue in the third quarter of 2020.

152.    In addition, broadcasting and transmission costs added another $9.8 million to the Company's expenses.

153.    FuboTV reported a "non-GAAP adjusted contribution margin" of 16.1% in the third quarter of 2020.

154.    An adjusted contribution margin is defined by the Company as "platform bookings minus variable cost of goods sold ('COGS')." In other words, "Contribution Margin," is this contribution divided by platform bookings.

155.    Platform bookings is disclosed in this fashion to the investing public:  The Company takes the revenue actually recognized during the quarter and adds the change in deferred revenue.

156.    When the Company sells a subscription to a new subscriber, revenue is recognized over the lifetime of the subscription. Deferred revenue is initially increased on the Company's balance sheet on the liability side to offset the increase in cash from the subscriber's payment. That deferred revenue is then recognized as revenue over time.  The costs associated with

delivering the service are also recognized over time.

157.    Accordingly, platform bookings represent revenue recognized in the current period plus some portion of revenue that will be recognized in future periods.  Variable COGS is the following:  The Company starts with subscriber related expenses for the current period, then  adds costs related to payment processing, then subtracts other costs, notably costs associated with minimum guarantees for its affiliate distribution deals.

158.    The net result is that variable COGS is less than the reported subscriber related expenses.  This metric is false and misleading for the following reason.  Platform bookings includes a portion of future revenue yet to be recognized, while variable COGS do not include the subscriber related expenses associated with that future revenue.

159.    Therefore, in this metric, the Company is pulling forward revenue without also pulling forward the correspondingly associated expenses.

160.    In addition, because the change in deferred revenue is a function of subscriber growth, this contribution margin metric is higher when the Company is adding a lot of subscribers. Using this non-GAAP metric is false and misleading because it does not reveal to shareholders and investors that metric does not reveal whether the additional subscribers are profitable or not.

161.    As a result, the Company's non-GAAP adjusted contribution margin is a meaningless number.  It is a function of how quickly the Company is gaining subscribers, not a representation of profitability.

## THE TRUTH BEGINS TO EMERGE

162.    On December 23, 2020 — following days of meteoric rise—Richard Greenfield of Lightshed Partners ("Lightshed") initiated coverage of the Company at a sell rating and a $8 one-year price target.  In connection with initiating coverage, Lightshed called prospects of the

Company achieving success with sports betting a "pure fantasy." Lightshed further observed that the Company "[may be] the most compelling short we have ever identified in our career as analysts."

163.    On the same day, the Company was downgraded by BMO Capital Markets to "market perform" from "outperform," noting that the Company "valuation had gotten overheated" and explaining that "Fubo parted ways with WarnerMedia networks earlier this year, so it won't have a chunk of NBA regular-season games or the NCAA men's basketball tournament."

164.    On this news, the shares of the Company declined $11.9, or 21.22% over two days, to close at $44.18 on December 24, 2020.

165.    On December 27, 2020, Lightshed filed another report entitled *FuboTV is a Money Losing vMVPD, FuboTv is not Roku nor FanDuel; Sell Now*, in which Lightshed called the Company a "money-losing virtual MVPD" and urged investors to sell FUBO securities. Lightshed questioned whether fuboTV can turn its "fundamentally flawed MVDP/vMVPD business into a good one, especially if it lacks scale and other product bundles." Citing an "army of retail investors" as the reason for the gain in the stock's popularity, Lightshed further rejected Fubo's differentiation theory, stating that: "Fubo is not Netflix, Fubo is not Flutter/FanDuel, DraftKings nor even Penn/Barstool Sports, Fubo is not Roku and Fubo is not Trade Desk. Fubo is simply just another virtual multichannel video programming distributor (vMVPD) facing the same obstacles and financial challenges as every other vMVPD."

166.    On the publication of Lightshed's second report, which harshly criticized the Company's business model, the price of the Company shares declined $5.24, or 11.86%, to close at $38.94, on December 28, 2020.

167.    On December 28, 2020, the barrage by securities analysts continued with Hedgeye

analyst, Andrew Freedman, questioning the Company's valuation on the grounds that "a more bullish scenario with 1.5M paid subscribers, $100 ARPU, and 15% adjusted EBITDA margin still only gets the stock up to $23/share."

168.    On this news, the Company's shares declined additional 0.51%, to close at $38.74 on December 29, 2020.

169.    The Company's shares continued its downward spiral on December 30, 2020, when Kerrisdale Capital published a report entitled "fuboTV Inc. (FUBO), Requiem for a Stream ("Kerrisdale Report"), which comprehensively dismantled all aspects of the Company's business model and exposed the Company's flawed strategy.  More specifically, the Kerrisdale Report attacked the Company's core subscription business as "structurally unprofitable," due to "high variable content costs with contracted escalators," which burdened revenue stream and prevented the Company from ever making any money.

170.    The Kerrisdale Report sided with other securities analysts in criticizing the Company's valuation as "absurd" given the size of its core subscription business and its "flimsy valuation comparison" to Roku, which, unlike the Company, has an immense range of content with dominant market share.

171.    The Kerrisdale Report further revealed that the Company "does not have any data or inventory that is differentiated and cannot provide the reach many advertisers crave." The Kerrisdale Report explained that connected TV, which is the source of advertising revenue, has been on a decline in the past two years with a massive increase in ad inventory being anticipated in the coming years.  The Company, having "nothing to differentiate itself [and] levers pull to meaningfully improve its pricing," has no ability to sell more advertising.

172.    The Kerrisdale Report also criticized the Company's acquisition of Balto Sports as

a "foolish" attempt to enter the "already highly competitive space [of sport wagering]." The Company used sports betting as bait for the investors by announcing that "fuboTV intends to expand into online sports wagering market" in its November 10, 2020 Letter to Shareholders but then acquiring Balto Sports, "a company with 3 employees," "no valuable IP," and "a failed test product" that "had mothballed operations during the pandemic."

173.    The Kerrisdale Report questioned the Company's strategy: "dropping content to manage costs is reactionary and destined to cause eventual spikes in churn and SAC.  All the Company can do is continue to raise price, take on more and more expensive tiers, thereby shrinking its addressable market."  According to the Kerrisdale Report, the Company's large increase in new sign-up activity was due to resumption of sporting activity [after it was halted due to COVID-19 Pandemic] and the U.S. presidential election, and those numbers will not be repeated.  As per the Report, the Company app download data suggests gross additions have collapsed since Election day and sit at a flat level compared to last year.

174.    On the publication of the Kerrisdale Report, the Company shares declined another $9.7, or 25.72%, to close at $28.00 on December 31, 2020, on unusually high trading volume.

175.    Then, on January 4, 2021, *Motley Fool* published an article titled *There's a Big Problem with FuboTV Stock* with a subtitle "The wildly unprofitable streamer tries to put lipstick on a pig with a creative metric." The *Motley Fool* article questioned the Company's business model, reporting that the Company is "nowhere close to turning a profit" as "direct costs of delivering its service are higher than revenue."  Relatedly, the article noted that "subscriber related expenses, which include affiliate distribution rights and cloud computing charges, among other things, were slightly higher than revenue in the third quarter."

176.    The *Motley Fool* article also questioned Company's other financial metrics

including Non-GAAP adjusted contribution margin, which fuboTV reported to be 16.1%, and

accused FuboTV of "concoct[ing] a profitability metric that's positive," concluding:

> It should now be pretty clear that fuboTV's adjusted contribution margin is a
> meaningless number. It's a function of how quickly the company is gaining
> subscribers, not a representation of profitability. The fact that the company reports
> such a misleading metric is a huge red flag. It's reason enough to stay far away
> from the stock

177.    On this news, the Company shares declined additional $3.99, or 14%, to close at

$24.24 on January 4, 2021.

178.    On January 28, 2021, Defendants caused the Company to file a Form 8-K with the

SEC announcing its proposed private offering of $350.0 million aggregate principal amount of

convertible senior notes due 2026, offered to ". . . persons reasonably believed to be qualified

institutional buyers . . . ." The accompanying press release states the proceeds will be used for

"general corporate purposes and further states ". . . it has not designated any specific uses and has

no current agreements with respect to any material acquisition or strategic transaction."

179.    Also, attached to the January 28, 2021 Form 8-K is a "Updated Business

Information", which states in relevant part:

> We are also investing to accelerate expansion into the sports wagering space,
> which we believe will be a complementary revenue stream to our current
> business model. Sports wagering is a rapidly growing and large opportunity.
> According to Zion Market Research, the global sports betting market is
> expected to reach approximately $155 billion by 2024. ***We believe we are well
> positioned to offer a seamless viewing and wagering experience by
> combining online sports wagering with our live sports streaming package.
> We recently announced our interest in expanding into wagering and our
> subsequent acquisition of Balto and pending acquisition of Vigtory***. We plan
> to leverage Balto's contest automation software to launch a free to play game
> offering. If the pending Vigtory acquisition is consummated, we would expect
> to add Vigtory's sportsbook technology and pipeline of market access
> agreements to our business. Our intended online wagering strategy includes
> the roll-out of free to play gaming in the summer of 2021, the launch of a
> sportsbook application by the end of 2021 and ultimately the integration of
> wagering with our live TV streaming platform. By expanding into free to play

gaming, we believe we can build further scale and drive additional subscribers. Furthermore, we expect that expanding into sports wagering will help drive engagement on our platform and additional monetization potential in the future.  [Emphasis added].

180.    On March 25, 2021, Defendants caused the Company to file its annual report for the year ended December 31, 202 with the SEC on Form 10-K (the "2020 Annual Report"). Regarding its intention to expand into sports wagering, Defendants caused the Company to state:

> We are investing to accelerate expansion into the sports wagering space, which we believe will be a complementary revenue stream to our current business model.  We recently announced our intent to expand into wagering and our subsequent acquisition of Camo Holdings Inc. d/b/a Balto ("Balto") and acquisition of Vigtory, Inc. ("Vigtory").  We plan to leverage Balto's contest automation software to launch a free to play game offering.  With the Vigtory acquisition, we expect to add Vigtory's sportsbook technology and pipeline of market access agreements to our business. Our intended online wagering strategy includes the planned roll-out of free to play gaming in the third quarter of 2021, the launch of a sportsbook application by the end of 2021 and ultimately the integration of wagering with our live TV streaming platform. By expanding into free to play gaming, we believe we can build further scale and drive additional subscribers.

181.    In the 2020 Annual Report, Defendants caused the Company to admit that "[w]e have incurred losses since inception . . . .  If our revenue and gross profit do not grow at a greater rate than our operating expenses, we will not be able to achieve and maintain profitability."

182.    In each of the above statements and when discussing Balto, Defendants caused the Company to fail to disclose that Balto is a startup company comprised only three founders and two additional employees.

183.    In each of the above statements, and when discussing Vigtory Inc., Defendants caused the Company to fail to disclose that Victory Inc. is a startup company comprised of less than ten employees.

## DAMAGES TO THE COMPANY

184.    As a direct and proximate result of Defendants' conduct, the Company will lose and

expend many millions of dollars.

185.   Such expenditures include, but are not limited to, legal fees and payments associated with the numerous lawsuits and other actions lodged against the Company as a result of the misconduct discussed herein.

186.   In addition, these losses include, but are not limited to, lavish compensation and benefits paid to Defendants who breached their fiduciary duties to the Company.

187.   As a direct and proximate result of Defendants' conduct, the Company has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

188.   Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of Defendants' breaches of fiduciary duties and other wrongful conduct as alleged herein and that occurred during the Relevant Period.

189.   Plaintiff will adequately and fairly represent the interests of fuboTV in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

190.   Plaintiff is a current owner of the Company stock and has been an owner of Company stock during the Relevant Period.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

191.   Because of the facts set forth herein, Plaintiff has not made a demand on the Board of the Company to institute this action against the Director Defendants.  Such demand would be a

futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

192.    At the time this suit was filed, the Board was comprised of seven (7) members -- Bronfman, Ahn, Figueras, Onopchenko, Leff, Gandler, and Pärson.  Thus, Plaintiff is required to show that a majority of Defendants, *i.e.*, four (4), could not exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

193.    The Director Defendants face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning the information described herein.  Because of their advisory, executive, managerial, and directorial positions with the Company, the Director Defendants had knowledge of material non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

194.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

195.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this Complaint, Plaintiff did not make (and was excused from making) a pre-filing demand on the Board to initiate this action because making a demand would have been a futile and useless act.

196.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs

complained of herein and are therefore not disinterested parties.

197.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

198.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

## THE DIRECTOR DEFENDANTS WERE NOT INDEPENDENT

### Defendant Gandler

199.    Defendant Gandler serves as the Company's CEO.  The Company provides Defendant Gandler with his principal occupation, and he receives handsome compensation for his services.  Defendant Gandler was responsible for most of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings referenced herein, many of which he either personally made or signed off on.

200.    Defendant Gandler is a defendant in the securities class action entitled *Ibrahim v. fuboTV, Inc., et al.*, Case 1:21-cv-01412 (S.D.N.Y.) and *Lee v. fuboTV, Inc., et al.*, Case 1:21-cv-01641 ("Securities Class Action") and faces a substantial likelihood of liability; therefore, demand on Defendant Gandler is futile.

201.    In addition, Defendant Gandler is also a member of the board of directors, along with Defendants Bronfman and Leff, of Waverly Capital Acquisition Corp.  Defendant Gandler's close business ties with Defendant Bronfman and Leff beholden him to these defendants, and vis-

à-versa.  Any notion that Defendant Gandler would elect to sue these defendants as a result of their close business ties, is not plausible.  Therefore, demand on Defendant Gandler is excused as to him.

## Defendant Bronfman

202.    Defendant Bronfman is a defendant in the Securities Class Action and faces a substantial likelihood of liability; therefore, demand on Defendant Bronfman is futile.

## Defendant Bronfman and Leff

203.    Defendant Bronfman and Leff are both high ranking executive members of Waverley Capital, a media-focused venture capital firm.

204.    Defendant Leff is Co-Founder and Managing Partner of Waverley Capital.

205.    Defendant Bronfman is also a Co-Founder and Chairman of Waverley Capital.

206.    As a result of Defendants Bronfman and Leff's close business ties, they are unable to evaluate a demand with independence, and therefore, demand is excused as to Defendant Bronfman and Leff.

## Defendant Ahn

207.    Defendant Ahn has served as President of Content Distribution and Partnerships for Univision Communications Inc., or Univision, since July 2018.

208.    The Company has entered into affiliate distribution agreements with *New Univision Enterprises, LLC* and related entities, AMC Network Ventures, LLC and related entities, Viacom International, Inc. and related entities and Discovery, Inc. and related entities, which are holders of the Company's convertible preferred stock.

209.    Because of Defendant Ahn's business ties with a company that he is President (Univision) and fubotv and the prospect of doing more business with the Company casts doubt on

his disinterestedness.

**Defendants Onopchenko, Ahn and Leff**

210.    Defendants Onopchenko, Ahn and Leff served as members of the Audit Committee during the Relevant Period.  Pursuant to the Audit Committee Charter, the Audit Committee Defendants were responsible for, inter alia, the effectiveness of the Company's internal controls, the integrity of its financial statements, and aspects of risk management and legal and regulatory compliance that may affect the Company's financial reporting.  Defendants Onopchenko, Ahn and Leff failed to ensure the integrity of the Company's internal controls, as they are charged to do under the Audit Committee Charter and to issue false and misleading financial statements with the SEC.  Thus, Defendants Onopchenko, Ahn and Leff breached their fiduciary duties, are not disinterested, and demand is excused as to them.

## COUNT I

### (Against the Director Defendants for Breach of Fiduciary Duty)

211.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

212.    The Director Defendants owed the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

213.    The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, full and accurate disclosure, and good faith.

214.    The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by allowing or permitting false and misleading statements

to be disseminated in the Company's SEC filings and other disclosures and, otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

215.    As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

216.    As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending and/or settling securities lawsuits and governmental investigations, severe damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT II

### (Against the Director Defendants for Waste of Corporate Assets)

217.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

218.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

219.    As a result of the misconduct described above, the Director Defendants wasted corporate assets by, *inter alia*: (a) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (b) awarding self-interested stock options to certain officers and directors; and (c) incurring potentially millions of dollars of legal liability and/or legal

costs to defend and/or settle actions addressing Defendants' unlawful actions.

220.    As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

221.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(A)    Declaring that Plaintiff may maintain this action on behalf of the Company and that Plaintiff is an adequate representative of the Company;

(B)    Finding Defendants liable for breaching their fiduciary duties owed to the Company;

(C)    Directing Defendants to take all necessary actions to reform and improve the Company's corporate governance, risk management, and internal operating procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the wrongful conduct described herein;

(D)    Awarding damages to the Company for the harm the Company suffered as a result of Defendants' wrongful conduct;

(E)    Awarding Plaintiff the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

(F)    Awarding such other and further relief as is just and equitable.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: May 12, 2021

**GAINEY McKENNA & EGLESTON**

By: */s/ Gregory M. Egleston*
    Gregory M. Egleston
Thomas J. McKenna
501 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: gegleston@gme-law.com
Email: tjmckenna@gme-law.com

*Attorneys for Plaintiff*

## **VERIFICATION**

I, ROBERT ROSENFELD, declare that I have reviewed the Amended Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of fuboTV, Inc. ("FuboTV") and authorize its filing.   I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true.  I further declare that I am a current holder, and have been a holder, of fuboTV as set forth in the Complaint.

Executed this ___11th___ day of May 2021.


ROBERT ROSENFELD